444 So.2d 1304 (1984)
SPEEDEE OIL CHANGE NO. 2, INC.
v.
NATIONAL UNION FIRE INSURANCE COMPANY.
No. CA-0980.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 1984.
Rehearing Denied February 22, 1984.
*1305 Richard V. Dymond, Gulfport, Miss., Hugh D. Aldige, Metairie, for plaintiff.
Robert E. Couhig, Jr., Philip A. Franco, Adams & Reese, New Orleans, for defendant.
Before REDMANN, C.J., and GULOTTA and AUGUSTINE, JJ.
REDMANN, Chief Judge.
A legal malpractice insurer appeals from a judgment in this direct action, La.R.S. 22:655, for $54,800 damages from failure to timely exercise an option to extend a lease. The attorney at law insured by defendant had advised one of plaintiff corporation's promoters in writing that the option to extend could be exercised until 31 days after the termination of the lease.
The basic issues are whether the corporation has any right to recover for the attorney's mistaken advice to the promoter, and whether the attorney's advice was so obviously a mistake that the promoter and the corporation cannot reasonably have accepted *1306 and acted upon it and it therefore cannot be a legal cause of the corporation's loss.
We conclude that the corporation as an intended third-party beneficiary may recover from the attorney upon his contract with its promoters; and that the corporation's vice-president's breach of his own contractual duty to the corporation by relying on the obviously mistaken advice does not relieve the attorney of liability towards the corporation.

Facts
The attorney had earlier incorporated SpeeDee Oil Change, Inc., for three persons. Those three persons later incorporated plaintiff corporation, and for convenience are referred to as its promoters. The promoters learned in the summer of 1980 that Gulf Refining Company intended to abandon a service station operation at a leased location that the promoters deemed suitable for a second oil-change business. Gulf's lease, then almost 25 years old, provided rent of $350 a month over its whole life, with an initial term of 15 years, "expiring March 14, 1971 ... [with] the right to extend this lease for three additional terms of five years each, by giving lessor written notice of [lessee's] election to exercise this right of extension at least 30 days before the expiration of each term." The first two five-year extension options had been exercised by Gulf. Gulf agreed to transfer the lease and its equipment etc. on the site for $6,000, and about July 28, 1980 was paid $600 as a deposit. By agreement dated August 19, 1980 by Gulf in Texas (with attached settlement calculations dated September 2, 1980), Gulf assigned the lease to SpeeDee Oil Change (apparently "Inc.," changed by handwriting to "No. 2, Inc."), and "SpeeDee Oil Change No. 2, Inc." dated its acknowledgments of execution September 10, 1980 in Louisiana. The assignment was effective September 1, 1980.
Meanwhile, the promoters had consulted the attorney who had incorporated the first SpeeDee, in regard to their (or the first SpeeDee's?) interest in Gulf's lease, and the tangible results were an August 18, 1980 letter from the attorney to one of the promoters (including the mistaken advice on the extension) and the September 9, 1980 articles of incorporation of a new corporation, SpeeDee Oil Change No. 2, Inc., with the three promoters as its directors and equal and sole shareholders. The attorney did not bill anyone for these services, he testified, but he had agreed on a flat fee. (One of the promoters answered they "might have mentioned it in passing" when asked whether they asked the attorney to "wait until you were on your feet and send you a bill.")
The August 18 letter reads:
"Re: Ground Lease-SpeeDee Oil Change, Inc. No. 2
"Dear Gary:
"Please be advised that I have reviewed the Lease Agreement and Amendment to Lease in connection with SpeeDee Oil Change, Inc. No. 2. According to the terms of the lease, Gulf Refining Company does not need the written consent of the Lessor in order to enter into a Sublease with SpeeDee Oil Change, Inc. [Sic] It also appears that the lease contains a provision that in the event Gulf be unable to operate a service station on the premises because of zoning or building restriction, Gulf has the option to terminate said lease. I believe that this provision should also be contained in the sub-lease between yourself and Gulf. I also wish to point out the manner by which the option is exercised. As you know, on March 14, 1981 the second five-year option period will terminate. In order to exercise the last three-year [sic] option, notice must be given in writing to the Lessor not later than April 14, 1981 in order to effect the third-year [sic] option. [Emphasis and bracketed matter added.]
"In reviewing the lease, I find nothing which would prevent you from entering into a sub-lease with Gulf Oil Corporation and utilizing the premises for your intended purposes.
"Trusting this will suffice for intended purposes, I remain, Yours very truly...."
*1307 The addressee of that letter was the person who acted for all three promoters in negotiating for the Gulf lease. The letter's reference to SpeeDee No. 2 shows that by the date of the letter, to the knowledge and presumably with the advice of the attorney, the promoters had decided to incorporate SpeeDee No. 2 to acquire the lease and operate a business on the leased premises. The letter's addressee later became the corporate vice-president, charged with attending to the corporation's "legal affairs" including the lease.
One of the three promoters took very little part in this matter because he was terminally ill at all pertinent times (although he was taken to see the proposed new site, was elected chairman and president of the new corporation, and as such signed the assignment of the lease). He died in December or January, before the time to exercise the option passed. The other two testified they never read the lease, although they knew it had to be extended by exercising the third five-year option.
The vice-president did not timely exercise the option because, he testified, he relied on the attorney's letter's advice and therefore marked his calendar for April 2 to renew before April 14. On March 16 the owner notified plaintiff that the lease had expired and this lawsuit resulted.
(It may also be said that Gulf's agent testified that, both at the time of the assignment and again in January 1980 when he reviewed Gulf's other leases, he had told the negotiating promoter, later vice-president, of the need to exercise the option 30 days before March 14. The vice-president testified he did not remember any such advice but in any event would take his attorney's advice rather than Gulf's agent's.)

The Corporation's Right
Defendant correctly states the basic principle that a corporation not yet in existence cannot be a party to a contract, because not then "legally capable of contracting," La.C.C. 1779(1).
But "All things, in the most extensive sense of the expression, ... to which rights can legally be acquired, may become the object of contracts," C.C. 1885, including future things, art. 1887; "all things that are not forbidden by law may legally become the subject of, or the motive for contracts," Hayes v. Muller, 245 La. 356, 158 So.2d 191, 194 (1963). Although a promoter may ordinarily bind only himself, one "may contract, in his own name, that another shall ratify or perform the stipulation which he makes," art. 1889, so that a promoter may oblige himself that his intended corporation will perform a stipulated obligation, such as to pay an attorney for pre-incorporation services (as authorized by La.R.S. 12:27). More pertinent to our case, "A person may also, in his own name, make some advantage for a third person the condition or consideration of a commutative contract ...; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract can not be revoked," art. 1890, so that a promoter may stipulate for the benefit of his intended corporation. The thirdparty beneficiary need not exist at the time of a contract in his favor by others; Planiol, Civil Law Treatise (La. Law Inst. trans.) II, 1241; Henn, Corporations (2d ed.) § 111.
By the time of the attorney's August 18 letter he understood that his legal advice on the option was intended for the use and benefit of the future corporation that he was in the process of forming. He had to know and intend that not the individual promoters but the future corporation would use his advice in respect to exercising the option to extend. The other party to the contract, the promoters, also knew and intended that. The future corporation was therefore the intended third-party beneficiary of the parties' contract for the lawyer's advice; and the corporation accepted the stipulation in its favor by (as the trial court found, supported by sufficient evidence) acting upon the advice.
As the intended and accepting third-party beneficiary of the contract, the corporation *1308 has the right to sue for damages from its breach.

Liability
The attorney concedes that his August 18 letter mistakenly stated a date a month after rather than before the lease's expiration. But his insurer argues that the corporation's vice-president could not reasonably have accepted and acted upon advice that (a) the lease terminates on March 14 and (b) the option to extend (to prevent termination) can be exercised as late as April 14, 31 days after termination occurs.
One may agree that the corporation's vice-president was, at the least, inattentive to his own contractual obligations to the corporation in relying on that advice. Had the attorney's mistake been not so obviousfor example, had he not set forth the March 14 expiration date; or had he written that the option had to be exercised by February 14, 1981, a calendar month of 28 rather than 30 days before expiration perhaps the vice-president could not be faulted for relying on that advice instead of reading the lease for himself. But no reading of a lease is necessary for the person of ordinary common sense to know that, once a lease has expired, its expiration can no longer be prevented, and therefore the letter's advice was on its face mistaken. One may agree that the vice-president should not have accepted the attorney's advice because so obviously mistaken.
Yet the attorney's gross inattentiveness to his obligation to give correct legal advice, to give a correct interpretation of a simple contractual provision, was also a legal cause of the corporation's loss, for had the attorney not given that mistaken advice the vice-president could not have thoughtlessly relied on it and presumably would not have allowed termination of the lease to occur without exercising the option to extend.
The corporation's loss was thus the result of the combined inattentiveness of both its vice-president and its attorney when both were contractually obliged towards the corporation to be attentive in respect to the time for exercising the option.
We reject the attorney's insurer's suggestion that, as in the case of delictual damage to a third person, the vice-president's "negligence" should be imputed to the corporation. Ours is not such a case. Ours is a contract case, in which only the corporation itself has been injured, and the injury is the result of breaches of contractual duty by two persons each contractually bound to the corporation. If we could say that the vice-president's breach made him liable to the corporation, that would neither eliminate nor reduce the attorney's liability, for vice-president and attorney would each be liable in solido.
The attorney's insurer is therefore liable to the corporation for its damages.
We are not unaware of the anomaly that the vice-president, although arguably of fault comparable to that of the attorney, will indirectly benefit from a judgment in favor of the corporation because he owns one third of its shares. Arguably, he may be liable to defendant, for contribution individually under C.C. 2103 and for unjust enrichment as a shareholder under C.C. 1965. But the corporation is not liable for its officers' or shareholders' debts, and the vice-president is not a party to this litigation. We therefore cannot here decide his rights or liabilities.

Quantum
We do correct the $54,800 amount of the judgment. Plaintiff paid only the old rent of $350 in the first and, as far as shown, second months after expiration of the lease. Instead of the $350 provided by the lease, it had to pay $1,150 for the next 36 months and $1,350 for the last 22 months of the lost five-year extension. Total damages are therefore only $50,800.

Decree
Amended to $50,800 principal amount and otherwise affirmed.