540 So.2d 440 (1989)
CITIZENS BANK & TRUST COMPANY
v.
WEST BANK AGENCY, INC. and Stephen Harmon.
No. 87 CA 1797.
Court of Appeal of Louisiana, First Circuit.
February 28, 1989.
Writ Denied May 12, 1989.
*441 Gordon A. Pugh, Baton Rouge, for plaintiff-appellee Citizens Bank & Trust Co.
Michael J. Uter, Baton Rouge, for defendant-appellant West Bank Agency, Inc., et al.
Before WATKINS, CRAIN and ALFORD, JJ.
WATKINS, Judge.
This case presents the interesting question of the application vel non of the civilian theory of "promesse de porte-fort" to a non-competition agreement for solicitation of insurance business, which agreement is part of an act of sale of an insurance agency. We conclude that the acts inherent in the obligation assumed by the seller, to the extent that those acts purport to restrain solicitation by a third person insurance agent, are prohibited by LSA-R.S. 22:1214. Since that portion of the agreement is unenforceable, the judgment of the trial court awarding damages is reversed.
Having reached this decision on the threshold issue, it is unnecessary to reach the broader issues raised by the parties, specifically the application vel non of a promesse de porte-fort to any non-competition agreement, and the reasonableness of the stipulated damages in the contract which is the subject of this litigation.
In July, 1984, Stephen Harmon, owner and operator of the West Bank (Insurance) Agency (West Bank) in Plaquemine, Louisiana, sold his business to Citizens Bank and Trust Co. (Citizens). The act of sale characterizes the purchase as a purchase of the "book of business," a term used in the industry to signify the current insurance customers an agency has. West Bank's book of business consisted of approximately 850 customers.
The sales contract included a two-year non-competition agreement aimed at protecting the customer files being purchased. The portion of the agreement that is pertinent to this litigation purports to establish a personal obligation on the part of Stephen Harmon. It reads:
Steve Harmon, and his relatives by blood or marriage, will not directly or indirectly by any means be employed by, own, or be associated with any business in Iberville Parish, Louisiana, wholly or in part, in any business similar to that presently conducted by West Bank; nor shall they solicit any insurance accounts domiciled or residing in Iberville Parish.
The contract of sale allocated 10% of the purchase price of $125,000.00 as consideration for the agreement not to compete. The contract also provided for "stipulated damages" to be "twice the gross premiums paid by any customer" listed in the book of business to any person or agent covered by the non-competition provision.
Stephen Harmon's adult son, Thomas Harmon, has been in the insurance business in Baton Rouge, Louisiana, for the past 20 years. Throughout the long careers of both father and son, both before and after the sale to Citizens, neither engaged in business dealings with the other's agency or the other's accounts.
Thomas Harmon had been acquainted with Freddie H. Pitre, Sheriff of Iberville Parish, for six or seven years prior to 1984. The two men had tickets near each other at Tiger Stadium in Baton Rouge. During the 1984 football season, Thomas Harmon and Sheriff Pitre became engaged in a conversation concerning insurance; the sheriff was complaining of high premium rates. The end result of that preliminary conversation was the purchase by the sheriff of *442 an insurance policy for his official vehicles. The policy premium was $69,900.00 and Thomas Harmon's insurance agency received $10,291.00 as a consultant's fee.
Learning that an insurance policy had been sold in Iberville Parish by a blood relative of Stephen Harmon, Citizens brought suit against Stephen Harmon for damages. The initial judgment of the trial court was in favor of the defendant. However, the unsuccessful plaintiff moved for a new trial, which was granted, and the trial court reversed itself. On April 3, 1987, the trial court rendered judgment in favor of the bank and against Stephen Harmon for damages in the amount of $139,800.00 (the premium times two) and for attorney fees in the amount of $6,000.00. Thereafter, the defendant Stephen Harmon perfected this devolutive appeal.
We have no reservations about the trial judge's factual findings. Indeed, counsel for both parties agree that the facts were barely disputed. Originally rendering judgment in favor of the defendant, the trial court noted that both Stephen Harmon and Thomas Harmon were innocent of any collusion. Indeed, the lack of any connexity between the obligor (Stephen Harmon) and the person (Thomas Harmon) whose act prompted the suit for breach of the non-competition agreement apparently led the trial court to initially rule against the obligee bank.

PROMESSE DE PORTE-FORT
In reversing itself, the trial court no doubt was convinced by the learned and cogent argument of counsel for the plaintiff concerning the civilian doctrine of promesse de porte-fort.
Both parties to this litigation agree that under Louisiana law Stephen Harmon and Citizens could not enter into a contract which would bind a third-person, specifically Thomas Harmon. However, appellee argues that Stephen Harmon could bind himself, by making himself liable for damages if Thomas Harmon did not refrain from soliciting insurance in Iberville Parish for a period of two years. Appellee cites as authority the codal provision for a promesse de porte-fort. LSA-C.C. art. 1977 provides:
The object of a contract may be that a third person will incur an obligation or render a performance.
The party who promised that obligation or performance is liable for damages if the third person does not bind himself or does not perform.
An Article 1977 contract is a type of security device similar to suretyship; the promisor (porte-fort) is bound only if the third person does not satisfy the obligation. However, the device differs from suretyship in that the porte-fort never becomes an accessory obligor. As long as the third party does not bind himself, the porte-fort is the sole obligor; as soon as the third person binds himself, the porte-fort is released.
Thus, a party cannot contract with a corporation not yet in existence, but a promoter and his attorney can enter into a contract whereby the promoter promises that the future corporation will pay the pre-incorporation fees. Speedee Oil Change No. 2, Inc. v. National Union Fire Ins. Co., 444 So.2d 1304 (La.App. 4th Cir.1984). Likewise, an owner of a partial interest in property cannot bind his co-owners in an agreement to sell, but he can bind himself to procure their agreement to sell or be liable for damages. Wendel v. Dixon Real Estate Co., 232 So.2d 791 (La.App. 4th Cir.), writ denied, 256 La. 249, 236 So.2d 29 (La.1970).
Considering the obligation incurred by Stephen Harmon in light of the codal provision, appellee urges that Stephen Harmon could promise the bank that his son would not compete in Iberville Parish. Stephen Harmon's obligation was that he would procure his son's agreement not to compete or failing to procure it, Stephen Harmon would pay damages.
All of the above may be a correct interpretation of Article 1977 and the promesse de porte-fort, however, under the particular facts of this case it is unnecessary for us to decide here whether the promesse de porte-fort, under Article 1977, is a legitimate *443 object for contract if the third party's obligation is a negative one, one of refraining from action, instead of a positive action. Likewise, it is unnecessary for us to decide here whether the promesse de porte-fort under Article 1977 is a legitimate object for contract when the contract in question is a non-competition agreement. Because the obligation herein involves a restriction of Thomas Harmon's activities as an insurance agent, the nature of his business disposes of the issues which would be extant in another type of case.

LOUISIANA INSURANCE CODE
We conclude that the trial court fell into legal error, not because a person cannot bind himself for the act of another, but because the particular obligation undertaken by the defendant was unlawful. The trial court overlooked the express prohibitions of the Louisiana Insurance Code, LSA-R.S. 22:1211, et seq.
Section 1213 of the Louisiana Insurance Code prohibits "any trade practice" which is "an unfair method of competition or an unfair or deceptive act or practice in the conduct of the business of insurance." Section 1214(4) specifically defines as unfair or deceptive the "[e]ntering into any agreement to commit or by any concerted action committing any act of boycott, coercion or intimidation resulting or tending to result in unreasonable restraint of, or a monopoly in, the business of insurance."
"The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy." LSA-C.C. art. 1968. If the obligation incurred by Stephen Harmon in the non-competition agreement is a promise to boycott, coerce or intimidate Thomas Harmon, then the agreement is unlawful and unenforceable.
Having reviewed the record, we conclude that there is sufficient evidence from which to infer that had Stephen Harmon procured his son's agreement not to compete, then Stephen Harmon would have engaged in coercion and intimidation contrary to the prohibition of the Louisiana Insurance Code.
Had Stephen Harmon told his son about the non-competition agreement and the serious penalties involved for breach thereof, it is reasonable to conclude that Thomas Harmon would have felt coerced and intimidated. Despite the fact that the value of the non-competition agreement was stated to be only $12,500.00, the stipulated damages could climb to any amount, without ceiling. For an extreme example, one need look no further than the damage award made by the trial court pursuant to the stipulated damage provision. The damages exceeded the value of the non-competition clause by $127,500.00, exceeded the value of the entire business by $14,800.00, and exceeded the agents' "commission" on the sale to the sheriff by approximately $125,000.00.
The thought of depriving his father of any profit from the sale of his lifelong business, plus out-of-pocket monies, would be disconcerting to most sons. Furthermore, it might well be against the son's own interest, since he could be faced with supporting a destitute, retired parent.
Finally we can infer intimidation from Thomas Harmon's own testimony. He stated that he was unaware not only of the non-competition agreement, but also of the fact of the sale to Citizens.
Q. You had not discussed this with your father?
A. Not at all.
Q. Did your father ever give you the names of any of his customers or clients in that period of the fall of 1984?
A. Never.
Q. How long had you known Freddie Pitre?
A. Six or seven years.
Q. Since he had become Sheriff?
A. Yes.
Q. Was your father at that LSU football game where you had this discussion with Sheriff Pitre?
A. Not that I recall. I'm almost sure that he wasn't.
Q. Since this particular lawsuit was filed have you attempted to do any business *444 in the insurance related field in Iberville Parish?
A. No, Sir, it scared me to death.
Tr. 59, lines 10-25.
It is clear that Stephen Harmon may not have comprehended the full import of the non-competition clause, since he performed no act to procure compliance by his son. But Citizens purposely and knowingly entered into the contract which tended to result in an unreasonable restraint of the insurance agent, Thomas Harmon, contrary to the Louisiana Insurance Code. Jeffrey W. Albright, the bank representative who negotiated with Stephen Harmon for the purchase of West Bank, testified that one object of the non-competition clause was to prevent Thomas Harmon from competing with the bank after the purchase.
Accordingly, the judgment of the trial court is reversed, and the demand of Citizens is dismissed. The appellee is cast in judgment for all costs in the trial court and on appeal.
REVERSED.