709 So.2d 1144 (1997)
WAREHOUSE HOME FURNISHING DISTRIBUTORS, INC., d/b/a Farmers Furniture
v.
Jackie E. WHITSON, et al.
1950534.
Supreme Court of Alabama.
October 10, 1997.
Rehearing Denied January 23, 1998.
*1146 William S. Pritchard III, James G. Henderson, and Nina M. LaFleur of Pritchard, McCall & Jones, L.L.C., Birmingham; and B. Clark Carpenter, Jr., of Wooten, Thornton, Carpenter, O'Brien, Lazenby & Lawrence, Talladega; Allen I. Hirsch, J. Randolph Evans, and Debra G. Buster of Arnall, Golden & Gregory, Atlanta, GA, of counsel, for appellant.
*1147 Lanny S. Vines, Lloyd W. Gathings, and Michael L. Allsup of Emond & Vines, Birmingham, for appellees (brief on application for rehearing filed by Floyd W. Gathings, of Gathings & Associates, Birmingham).
John R. Chiles and Richard H. Sforzini, Jr., of Sirote & Permutt, P.C., Birmingham, for amici curiae Alabama Retailers Ass'n and the Alabama Financial Services Ass'n.
KENNEDY, Justice.
Warehouse Home Furnishing Distributors, Inc., d/b/a Farmers Furniture ("Farmers Furniture") is a Georgia corporation that sells furniture, jewelry, and appliances. It operates 10 stores in Alabama, all of which provide financing if the customer requests it.
According to Farmers Furniture, until May 1986, its practice was to file a UCC-1 financing statement in order to protect its security interest in items that it financed for customers. Beginning in May 1986, Farmers Furniture began charging its customers a premium for what it called "nonfiling insurance," rather than filing a UCC-1 statement. When financing an item for a customer, Farmers Furniture also charged the customer for property insurance, unemployment insurance, accident and health insurance, and credit life insurance. The insurance premiums were included in the amount financed. Farmers Furniture then paid the premiums to its insurance company and was entitled to make certain claims on the insurance if a customer defaulted on the loan.
Jackie Whitson, Aubrey Strickland, Robin Gamble, and Rena Yates, seeking to act as representatives of a class made up of Farmers Furniture customers who had paid certain insurance premiums when they financed goods, sued Farmers Furniture. They alleged that Farmers Furniture had charged premiums for nonfiling insurance, property insurance, credit life insurance, accident and health insurance, and unemployment insurance in violation of the Alabama Consumer Credit Act, § 5-19-1 et seq., known as the "Mini-Code." They also alleged that Farmers Furniture had committed fraud in charging these premiums.
The trial court certified a class, defined as:
"All persons who have obtained a consumer loan from ... Farmers Furniture, in the State of Alabama in conjunction with the purchase of items at one of the defendant's Alabama stores since May 1, 1986, and have been charged for nonfiling insurance, credit life insurance, accident and heath insurance, or unemployment insurance."
The certification excluded from the class the following persons:
"Any person who has previously settled his or her claims against any of the defendants herein and has entered into a legally binding settlement agreement or release, or has obtained a judgment against said Defendants, on any claims arising from the person being charged for nonfiling insurance, credit life insurance, property insurance, accident and health insurance, or unemployment insurance or any person who is deceased at the time of the certification of the class described above."
The plaintiffs moved for a partial summary judgment holding that it was a violation of the Mini-Code for Farmers Furniture to charge a nonfiling insurance premium for customers who purchased and financed goods having a purchase price of $2,000 or less and whose financing contract had a scheduled payment on or after April 25,1993. The trial court entered a partial summary judgment declaring that violation; voided the contracts in which the violation had occurred; and assessed damages for the violations. It made the partial summary judgment final pursuant to Rule 54(b), Ala.R.Civ.P. Farmers Furniture appealed the certification of the class and the partial summary judgment.
We note that the plaintiffs' claims regarding fraud and the other insurance premiums charged to customers seeking financing are still pending in the trial court and that our review is limited to whether the court properly certified the class and whether the partial summary judgment was proper.
First, we will address the class certification. Rule 23, Ala.R.Civ.P., states certain prerequisites to be met in order for one to proceed with a class action: (1) the class must be so numerous that joinder is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or *1148 defenses of the class representatives must be typical of the claims or defenses of the class; and (4) the class representatives must be able to fairly and adequately protect the interests of the class.
We note that Rule 23 of the Alabama Rules of Civil Procedure reads the same as Rule 23 of the Federal Rules of Civil Procedure and that we consider federal case law on class actions to be persuasive authority for the interpretation of our own Rule 23. Adams v. Robertson, 676 So.2d 1265 (Ala. 1995), writ dismissed, 520 U.S. 83, 117 S.Ct. 1028, 137 L.Ed.2d 203 (1997).
The prerequisites of a class action are commonly referred to as "numerosity," "commonality," "typicality," and "adequacy." Numerosity and commonality concern the entire class, while typicality and adequacy concern the nexus of the named class representatives with the class itself. Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir.1996), aff'd. sub nom. Amchem Products, Inc. v. Windsor, ___ U.S. ___, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The United States Supreme Court noted in General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 157-58 n. 13, 102 S.Ct. 2364, 2370-71 n. 13, 72 L.Ed.2d 740 (1982):
"The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interests."
The first prerequisite has been met, given that the class as defined has over 13,000 members. The exact number is not now known, because Farmers Furniture apparently has not complied with the trial court's order to provide the names and addresses of the persons who would be members. However, Farmers Furniture does not dispute that at least this many customers financed their purchases and were charged certain insurance premiums.
The second prerequisite is met by the fact that there are common questions of fact with regard to the insurance premiums charged by Farmers Furniture, including the nonfiling insurance premium to which the partial summary judgment relates. See DeBoer v. Mellon Mortgage Co., 64 F.3d 1171 (8th Cir.1995) (commonality requirement met even though each customer had a separate contract with the bank, where main point of contention centered on allegation that the bank demanded too high an escrow balance for its mortgage loans), cert. denied, 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 648 (1996).
The conduct that is common to the class, according to the plaintiffs' arguments, is that Farmers Furniture created the "nonfiling insurance" charge to surpass the maximum finance charges allowed by the Mini-Code, to defraud the customer, and thereby to illegally increase its profits. Other conduct common to the class as a whole concerns the other credit insurance fees charged to financing customers that the plaintiffs say the Mini-Code did not allow Farmers Furniture to include in the amount a customer could finance and/or for which illegally high premiums were charged. As stated earlier, the claims regarding the other kinds of insurance are still pending, along with the fraud claim related to the charge for "nonfiling insurance."
Farmers Furniture contends that some of the class members' claims regarding the Mini-Code and the insurance premiums are barred by the statute of limitations. However, this does not mean that the class certification is barred. "The fact that questions peculiar to each individual member of the class may remain after the common questions have been resolved does not, by itself, mandate a refusal to grant class certification." Cosgrove v. First & Merchants National Bank, 68 F.R.D. 555, 560 (E.D.Va. 1975). Even if the limitations period has run on some of the class members' claims with regard to the Mini-Code violations, there is still a fraud claim based on this same conduct. *1149 See, e.g., Kennedy v. Tallant, 710 F.2d 711 (11th Cir.1983).
As to the third prerequisite, that the claims of the class representatives must be typical of the claims of the class, the plaintiffs met this requirement. All of the plaintiffs have had Farmers Furniture finance their purchase of consumer goods and have been charged for certain insurance premiums that the plaintiffs allege were fraudulent and/or in violation of the Mini-Code.
Farmers Furniture argues that only one of the class representatives has claims typical of the claims adjudicated by the partial summary judgment. We disagree. All of the class representatives have financed purchases through Farmers Furniture and as part of their finance transactions have paid for the nonfiling insurance that is the subject of the summary judgment, and all of them have paid those premiums to which the pending claims relate. The essence of the typicality requirement is that the relationship between the injury to the class representative and the conduct affecting the entire class of plaintiffs must be sufficient for the court to properly attribute a collective nature to the challenged conduct. In re American Medical Systems, Inc., 75 F.3d 1069 (6th Cir.1996).
Typicality exists when a plaintiff/class representative's injury arises from or is directly related to a wrong to a class and that wrong to the class includes the wrong to the plaintiff. Andrews v. American Tel. & Tel. Co., 95 F.3d 1014 (11th Cir.1996) (class representatives did not have to participate in a wide variety of "900" telephone number games of chance and credit-card offers to suffer harm typical of the class as a whole). Farmers Furniture charged each of the class representatives the very same insurance premiums (nonfiling insurance and the several types of credit insurance) that it charged to each class member; this fact makes the class representatives' claims "typical" of the claims of the class.
We find nothing in Farmers Furniture's brief to indicate that the class representatives are not adequately representing the class as a whole. The class representatives have appeared for depositions and are knowledgeable about the facts and the basic legal theories. Based on their individual deposition testimony, we conclude that each of them understands the theory behind the lawsuit, and we find nothing to indicate that any class representative has an interest that conflicts with the interests of the absent class members. See C.R. 1724-1824, 1830-1970, 1981-2124, 2131-2228.
As support for its argument concerning adequacy, Farmers Furniture cites Rothenberg v. Security Management Co., 667 F.2d 958 (11th Cir.1982), for the proposition that a named plaintiff who admittedly lacked any familiarity with the complaint or personal knowledge of the complaint was inadequate to serve as a representative. However, the facts in Rothenberg differ from the facts of this present case. First, in Rothenberg, the underlying action was a shareholder's derivative action and not a class action under Rule 23, Fed.R.Civ.P. The plaintiff in Rothenberg also showed an obvious refusal to become informed about her case, in that, during her third deposition, she still knew little about the lawsuit.
Farmers Furniture contends that "none of the named plaintiffs knows the first thing about this litigation, nor do they seem to care." (Appellant's brief, at 43.) We find, after reviewing the record, that all of the class representatives have indicated a knowledge of the charges imposed by Farmers Furniture against them and a willingness to proceed with the lawsuit on behalf of the class.
Farmers Furniture contends that two of the named representatives have criminal histories and, therefore, should not be class representatives. In support of this argument, it cites Armour v. City of Anniston, 89 F.R.D. 331 (N.D.Ala.1980), aff'd, 654 F.2d 382 (5th Cir.1981). Armour is easily distinguishable from the present case because in Armour the named representative perjured herself during the trial. The court held that her perjury with regard to the lawsuit barred her from representing the class. Additionally, the court held that the representative's *1150 claims were not typical of the claims of the entire class.
One of the two class representatives with criminal histories was charged with shoplifting many years ago and was arrested for assault after she and her ex-husband got into a fistfight. The assault charge was later dropped. The other representative was charged with DUI and with making harassing communications to a man who had threatened his wife. These charges also occurred several years before this lawsuit was filed. Unlike the perjured testimony in Armour, these two representatives' criminal activity was totally unrelated to the case and had happened years before the case was filed. We find nothing to indicate that these two representatives would not be fully capable of representing the class as a whole. Of course, evidence of the criminal activity may be admissible to impeach the representatives if the proper predicate is laid.
Farmers Furniture argues that certain of the class representatives should not be allowed to represent the class because, Farmers Furniture says, two of them had given away the goods they had purchased and another had purchased the goods for commercial use without telling Farmers Furniture of that fact. Farmers Furniture contends that these actions destroyed its security interest in the goods, and, therefore, it argues that these representatives do not have standing. We disagree. The crux of the plaintiffs' argument is that Farmers Furniture charged the nonfiling fee as protection against bad debt and not in lieu of filing a UCC-1 financing statement, as Farmers contends. Neither perfecting a security interest through the filing of a UCC-1 financing statement nor automatic perfection would protect a lender against bad debt. Therefore, such alleged action by the class representatives does not affect their standing to challenge the "nonfiling" fee.
Farmers Furniture presented evidence indicating that some of the class representatives had purchased additional consumer goods through "add-on" contractscontracts by which if a consumer has signed a financing contract for an item and later decides to finance the purchase of more items, the new contract would list as the amount financed the debt owed on the old purchase and the amount of the new purchase, but would list as collateral only the new goods. Farmers Furniture contends that its purchase money security interest in the old goods would be destroyed by the add-on contracts and the unpaid amount that had been financed under the original contract would not be secured under the add-on contract. It further argues that the class representatives with add-on contracts and any other class members with add-on contracts should not be part of the class.
However, add-on contracts do not always destroy perfection. If the add-on contract provides some method for determining the extent to which each item of collateral secures its purchase money, then an additional sale does not destroy perfection. Southtrust Bank v. Borg-Warner Acceptance Corp., 760 F.2d 1240 (11th Cir.1985); In re Freeman, 124 B.R. 840 (N.D.Ala.1991),aff'd, 956 F.2d 252 (11th Cir.1992); In re McCall, 62 B.R. 57 (M.D.Ala.1985).
The Farmers Furniture contract provided for a "first in, first out" method of allocating payments to debts in the order in which those debts were incurred. A purchase money security interest can survive an "add-on" sale when express contractual language allocating payments is present. In re Campbell, 129 B.R. 1020, 1023 (Bankr. S.D.Ala.1991) (add-on contract with first in, first out system of allocating payments to debts in the order in which those debts were incurred creates a properly perfected security interest).
Once the prerequisites have been met, the class action must fit within one of the types of classes described in Rule 23(b). The trial court found that the class and the relief sought by the class fell within Rule 23(b)(2), which relates to the situation in which "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."
*1151 In Adams v. Robertson, we held that so long as the relief sought is primarily equitable or injunctive, a class action settlement that also includes money damages with a mandatory non-opt-out provision is proper. 676 So.2d at 1271. We noted that simply because a class action settlement may ultimately result in an award of money damages does not prevent class certification under Rule 23(b)(1) or (b)(2).
We find persuasive DeBoer v. Mellon Mortgage Co., 64 F.3d 1171 (8th Cir.1995), cert. denied, 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 648 (1996), wherein the Court of Appeals for the Eighth Circuit dealt with a case involving excess escrowing of mortgage accounts. In DeBoer, some class members argued that the class should be certified under Rule 23(b)(3), thus allowing class members to opt out. The court held that whenever subsection (b)(1) or (b)(2) is applicable, subsection (b)(3) should not be used, so as to avoid unnecessary inconsistencies and compromises in future litigation. DeBoer, 64 F.3d at 1175, citing Reynolds v. National Football League, 584 F.2d 280 (8th Cir.1978) (discussing (b)(1)); 7A Charles A. Wright et al.,Federal Practice and Procedure §§ 1772, 1775, and 1777 (1986) (discussing (b)(1) and (b)(2) and noting that the privilege to opt out should be operable only when the class action is maintainable under Rule 23(b)(3) alone).
The DeBoer court held that certification under Rule 23(b)(2) was appropriate because the class sought injunctive relief against the alleged overescrowing practices. 64 F.3d at 1175, quoting 7A Wright et al., supra, § 1775, at 470 ("If the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)"). The DeBoer court noted that any prejudice as to a class member's ability to opt out was "`outweighed by the purposes behind class actions: eliminating the possibility of repetitious litigation and providing small claimants with a means of obtaining redress for claims too small to justify individual litigation.'" 64 F.3d at 1175, quoting Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 249 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).
In the instant case, the plaintiffs asked that the loans be voided and that money damages be awarded. (C.R.49.) The plaintiffs also request any other appropriate relief, which might include injunctive relief as to the pending claims in order to prevent the alleged misconduct.
Based on the foregoing, we find no error in the trial court's certification of the class.

Summary Judgment
Farmers Furniture charged the nonfiling insurance premium and included it as part of the money financed in regard to the loan for the consumer good. The plaintiffs contend that including the $10 nonfiling fee as part of the loan violated the Mini-Code because, they argue, the nonfiling fee was not "insurance." The plaintiffs argue that Farmers Furniture's charging a premium for insurance, in lieu of perfecting a security interest by filing a UCC-1 statement, violated the Mini-Code and was fraudulent because, they say, the security interest was already perfected by operation of law. Therefore, the plaintiffs say the nonfiling premium was not "insurance," there being no risk for Farmers Furniture. (As stated earlier, the claims regarding the other types of insurance, and the fraud claim involving nonfiling insurance, are still pending in the trial court.)
To enter a summary judgment, the trial court must determine that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. In determining whether a summary judgment was properly entered, the reviewing court must view the evidence in a light most favorable to the nonmoving party. Rule 56 is read in conjunction with the "substantial evidence rule" stated in § 12-21-12, Ala.Code 1975, for actions filed after June 11, 1987. Under the substantial evidence rule, once the movant makes a prima facie showing that there is no genuine issue of material fact, the nonmovant must rebut that showing by presenting "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West *1152 v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala.1989).
The purpose of the Mini-Code is to protect members of the public when they are dealing with those who make consumer loans; it seeks to achieve this purpose through strict regulation and supervision of the creditors themselves. Derico v. Duncan, 410 So.2d 27 (Ala.1982).
Farmers Furniture included the $10 nonfiling insurance premium in the amount of money financed by the customer; it subsequently remitted the premium to its insurance company. The plaintiffs contend that the nonfiling premium was, at best, a "finance charge," and therefore, was not to be included in the amount financed.
The Mini-Code defines a "finance charge" as:
"The sum of all charges, payable directly or indirectly by the person to whom credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The amount of the finance charge in connection with any credit transaction (i) shall be determined, and shall include and exclude the fees and charges, as provided by Section 106 of the Federal Truth-in-Lending Act, 15 U.S.C. Section 1605 and the regulations of the Federal Reserve Board promulgated pursuant to the Federal Truth-in-Lending Act, 12 C.F.R. Part 226, and the Official Staff Commentary adopted by the Federal Reserve Board pursuant to that regulation, and without limiting or affecting the foregoing subparagraph (i), (ii) shall exclude, without limitation, late charges and other charges resulting from or arising out of late payment, delinquency, default, or other like occurrence...."
§ 5-19-1(1).
The Federal Truth-in-Lending Act, cited in § 5-19-1(1), excludes from computation of a finance charge premiums for "insurance in lieu of perfecting any security interest" in the property. 15 U.S.C. § 1605(d).
According to Farmers Furniture, it charged the nonfiling insurance premium in order to protect its interest in the goods financedit says it chose to protect its interest in this manner rather than by filing a UCC-1 financing statement. Accordingly, Farmers Furniture contends that if the customer defaulted on the loan it would be insured against any losses due to its inability to repossess the goods because it had not filed the UCC-1 financing statement.
A UCC-1 financing statement perfects a security interest in personal property. That is, Farmers Furniture lends money to the customer to buy a piece of personal property and, in exchange for the loan, the customer gives Farmers Furniture an interest in the personal property while the customer repays the loan principal plus interest. If the customer defaults on the loan, Farmers Furniture can repossess the personal property.
However, in the case of a purchase money security interest in consumer goods, the security interest is automatically perfected under § 7-9-302(d)(1), Ala.Code 1975, and no UCC-1 financing statement has to be filed in order for the security interest to be perfected. Farmers Furniture argues that the nonfiling insurance premium it charged to its financing customers was intended to protect it against loss due to the inability to repossess the goods because no financing statement had been filed. However, under Alabama law, it already had a security interest in the goods. Therefore, Farmers Furniture was charging the customer for nonfiling insurance in lieu of perfecting a security interest by filing a UCC-1 financing statement, when the security interest was automatically perfected by law.
Insurance exists when a contractual relationship between the insurer and the insured shifts the risk of loss from the insured to the insurer. Strength v. Alabama Dep't of Finance, 622 So.2d 1283 (Ala.1993). There was no shifting of risk from Farmers Furniture to its insurance company because there was absolutely no risk of loss due to an unperfected security interest, i.e., there was no need for Farmers Furniture to insure itself for not filing a UCC-1 financing statement (presumably to protect its interest in the property), because its security interest was automatically perfected.
*1153 Because Farmers Furniture's security interest was automatically perfected, the nonfiling insurance "premium" cannot be a "charge in lieu of perfecting any security interest" and is, thus, part of the finance charge and not a part of the amount to be financed. See Tumlin v. Wedlo, Inc. (In re Tumlin), Ch. 13 Case No. 94-41320, Adv. No. 94-40584 (N.D. Ala., April 17, 1995) (because the defendant's security interest in jewelry was automatically perfected, the nonfiling insurance could not qualify as a "charge in lieu of perfecting any security interest" and, therefore, was a finance charge). The nonfiling insurance premium cannot be considered insurance, because there was no shifting of the risk; Farmers Furniture had no risk, because of its automatically perfected security interest.
Additionally, the charge for "nonfiling insurance" cannot be considered an insurance premium because of the language in the contract between Farmers Furniture and its insurance company. That contract contained a clause that stated:
"Any single loss payable under this Agreement shall not exceed the value of the property represented by the security instrument at the time Insured makes claims under this Agreement. The maximum aggregate amount the Insured may claim under this Agreement shall not exceed 93% of the Insured's premiums cumulatively collected and paid to the Company. Any subsequent recovery of such claims paid will be forwarded to the Company as Subrogation to reduce the aggregate amount of the claims paid to the Insured."
This clause means that the insurance company would never have to pay out more in claims than 93% of the nonfiling insurance premiums paid to the insurance company by Farmers Furniture. Any payout on claims is based entirely on the amount of premiums remitted by Farmers Furniture; it would not come from a pool of premiums collected from similarly situated creditors. The insurance company retained 7% of the premiums, calling it an "administrative fee."
Here is an example of how the policy worked. If Farmers Furniture financed 10 items, each costing $75, for 10 different customers, each customer paid $10 for the nonfiling insurance premium; that $10 was included in the amount financed. Farmers Furniture would remit $100 to the insurance company (10 customers × $10). If a customer defaulted, Farmers Furniture could make a claim against its policybut its total claims could be no more than 93% of the premiums paid.
Assume that all 10 customers defaulted. Farmers Furniture could make a claim under the policy and could receive $93. However, each of the items was worth $75, making the total value $750 (10 items × $75). Remember that the purpose of charging the nonfiling premium was to protect Farmers Furniture against the risk incurred as a result of its not filing UCC-1 financing statements and, presumably, its being unable therefore to repossess the item itself in case of a default. All Farmers Furniture would receive would be 93% of the premiums it had paid, not 93% of the value of the item financed.
The insurance company had no risk, because it never paid out more in "claims" than it collected in premiumsthat is because in regard to the aggregate claims it would not have paid Farmers Furniture what all the items were worth but rather would have paid a total amount no greater than 93% of the total premiums paid by Farmers Furniture. Similarly, Farmers Furniture had no risk, because it had an automatically perfected security interest; this meant it could repossess the item financed without having filed a UCC-1 financing statement.
The plaintiffs argue in the alternative that if the nonfiling premium was indeed insurance, it was "default" insurance and was not insurance "in lieu of perfecting any security interest." The losses on which claims would be paid under this default policy included losses due to "bankruptcy, skips, and destroyed goods." (C.R.1341.) Thus, claims made under the policy were not made to cover losses occurring because Farmers Furniture could not repossess the item; the actual claims made under the policy were made on items that could not be repossessed because the customer had filed for bankruptcy protection, had skipped town, or had somehow *1154 destroyed the goods. Therefore, the policy as applied did not provide insurance to cover losses that occurred because there was no financing statement; rather, it would have been insurance to cover losses occurring because it was impossible to repossess the item. The Mini-Code allows a lender to exclude from the "finance charge" an insurance premium that insures the creditor for losses occurring as a result of the lender's not "perfecting any security interest," but it does not allow the lender to exclude a charge for "default" insurance. In sum, Farmers Furniture's nonfiling premiums were used to create a reserve for bad debts and were not used to provide insurance.
Farmers Furniture cites Mitchell v. Industrial Credit Corp., 898 F.Supp. 1518 (N.D.Ala.1995), for the proposition that the nonfiling fees it charges are insurance premiums and, therefore, are properly included in the amount of money financed, rather than part of the finance charge. First, we note that Mitchell did not involve purchase money security interests in consumer goods (i.e., it did not involve lending the consumer money to buy a particular good). Rather, in Mitchell, the defendant was making loans secured by collateral already owned by the plaintiffs, for which collateral the nonfiling insurance was appropriate. However, the Mitchell court entered a partial summary judgment for one of the plaintiffs, as to whose property a security interest already had been perfected when he was subsequently charged a nonfiling insurance premium:
"The third argument in support of plaintiff Martin's contention that a charge for lien insurance was improperly excluded from the finance charge of his November 17, 1992 loan is that the charge was imposed in addition to perfecting a lien rather than `in lieu of perfecting a lien,' as required by the Mini-Code. It is undisputed that plaintiff Martin was charged a $15.00 fee for lien insurance in connection with the November 17, 1992 loan he obtained from [the defendant]. [Citation omitted.] This loan was secured by a 1973 Ford pickup and a 1979 Fairmore mobile home.... It is also undisputed that at the time ... Martin obtained this loan and was charged a fee for lien insurance, these same two items which were pledged as security for this loan were the subject of a previous security agreement between Douglas Martin and [the defendant] and that [the defendant] had filed a UCC-1 financing statement covering these two items. [Citation omitted.] Thus, argues Martin, at the time of the execution of the November 17, 1992 loan, [the defendant] was in fact already perfected as to the items of collateral, and therefore, the amount charged for lien insurance was not `in lieu of perfecting a security interest' as required by the act but was actually in addition to perfection, and as such should have been included in the finance charge. The finance charge on the November 17, 1992 loan is shown to be $328.92, and [the defendant] has admitted that this is the maximum rate permitted by the Mini-Code. [Citation omitted.] Thus, if the fee charged to plaintiff Martin for lien insurance were added to the finance charge, the finance charge would necessarily then exceed the maximum rate permitted by the Mini-Code. [Footnote omitted.] The court agrees with plaintiff Martin, and the undisputed evidence clearly shows that he was charged a $15.00 fee for lien insurance in addition to perfection rather than in lieu of perfection and that this amount should have been included in the amount financed because only fees for insurance in lieu of perfection are excluded from the definition of a finance charge."

898 F.Supp. at 1528 (emphasis added).
In Mitchell, the court held that including the nonfiling insurance premium as part of the amount financed violated the Mini-Code because the security interest was already perfected and, thus, the nonfiling insurance premium was not an insurance charge, but was a finance charge. Stated differently, the security interest was already perfected and the defendant therefore should not have charged the plaintiff for nonfiling insurancethere was no need to file, given the existing perfection.
We find persuasive a recent Florida case in which consumers were charged $7 in relation *1155 to the purchase and financing of consumer goods. The consumers sued Badcock Furniture, alleging that the $7 charge was in reality part of the charge for credit and thus was part of the "finance charge" and thus that Badcock had violated the Florida Deceptive Trade Practices Act and the Truth-in-Lending Act. The court held:
"[W]ith few exceptions, Badcock did not have an insurable interest which was covered by the nonfiling policy issued to Badcock by American Bankers [Insurance Company]. The exceptions were the few instances when the collateral was sold to a third party for value without knowledge of the security interest. Badcock's security interest in its credit sale of consumer goods is automatically perfected at the time of its creation.... [Citations omitted.] A perfected secured creditor has priority over an unsecured creditor and over a subsequent lien creditor, even the trustee in bankruptcy. [Citation omitted.]
"Further, it appears American Bankers assumed no risk of loss, because its liability under the agreement was limited to ninety percent of the amount collected as premiums. Although the record indicates that Farmers Furniture and Heilig-Meyers have enrolled in similar programs with American Bankers or its affiliate, Voyager, no evidence was presented of a general scheme to distribute the loss among a larger group of retailers with similar risks. In addition, no evidence was presented that the fee or premium charged was based on an analysis of Badcock's potential losses based on past experience. Badcock determined the amount of fee to be charged, i.e., seven dollars, and collected that amount in connection with each financed purchase of consumer goods in the amount of two hundred dollars or more. The fees were then transmitted to American Bankers, which returned ninety percent of the amount collected to Badcock on a monthly basis.
"A review of the provisions of the Insurance Code cited by Badcock demonstrates that nonfiling insurance is a valid product, which, in appropriate circumstances, is subject to regulation by the Department of Insurance. However, the conduct here at issue does not qualify as insurance under the criteria set forth in [Professional Lens Plan, Inc. v. Department of Insurance, 387 So.2d 548, 550 (Fla.Dist.Ct.App.1980)]. Instead, it appears Badcock imposed an additional charge on its credit customers under the guise of collecting an insurance premium. Designation of the charge as a premium for credit insurance would have required Badcock to include it in the finance charge. [Citation omitted.] In actual practice, Badcock included the charge in the amount financed."
W.S. Badcock Corp. v. Myers, 696 So.2d 776, 782-83 (Fla.Dist.Ct.App.1996).
Accordingly, the trial court did not err in holding that there was no genuine issue of material fact as to whether the nonfiling insurance premium was a finance charge rather than a charge for insurance in lieu of perfecting a security interest.
The next question is whether the plaintiffs' evidence required the holding that Farmers Furniture acted "deliberately" when it included the nonfiling premium as part of the amount to be financed rather than as part of the finance charge. Again, by including the nonfiling premium in the amount to be financed, it increased the amount of the loan to be financed by Farmers Furniture and the amount of interest that could be earned.
If the nonfiling premiums are taken out of the "amount financed" and, instead, are included as a "finance charge," as they should have been, then the financing charge exceeds what is allowed under the Mini-Code, § 5-19-3. The plaintiffs contend that Farmers Furniture acted deliberately in making the excessive finance charges and that because it did so damages pursuant to § 5-19-19 should be imposed. The trial court agreed; it ordered that the loan contracts that charged nonfiling premiums be voided and that the class members be reimbursed for all the money they had paid under those contracts.
We think that the question whether Farmers Furniture deliberately violated the Mini-Code should be answered by a jury. We agree with what the Court of Civil Appeals stated in Ingram v. Bank of Brewton, 340 So.2d 815, 817 (Ala.Civ.App.1976): "Whether *1156 the making of an excess charge was made with deliberateness or reckless disregard is a question of fact to be answered from the evidence." The judgment is affirmed to the extent it holds that the charge was not a charge for insurance in lieu of filing and holds that the charge violated the Mini-Code. It is reversed to the extent it voided the contracts that included that charge and assessed damages for the violation.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ALMON, SHORES, and COOK, JJ., concur.
BUTTS, J., concurs in the result.
MADDOX, HOUSTON, and SEE, JJ., concur in part and dissent in part.
HOOPER, C.J., dissents.
HOUSTON, Justice (concurring in part and dissenting in part).
The mere fact that the lien insurance Farmers bought from an insurance company had a 93% stop-loss feature did not make the lien insurance any less insurance. Ala.Code 1975, § 27-1-2; Schoepflin v. Tender Loving Care Corp., 631 So.2d 909 (Ala.1993); Metmor Financial, Inc. v. Commonwealth Land Title Insurance Co., 645 So.2d 295 (Ala.1993). Farmers had a written insurance contract with Voyager Guaranty Insurance Company (which contract had been approved by the Alabama Department of Insurance) pursuant to which Farmers turned over to Voyager the nonfiling premiums obtained from the named plaintiffs and the members of the plaintiff class. Voyager placed these premiums into a fund against which Farmer was entitled to make claims for losses occasioned by nonfiling of UCC-1 financing statements.
The trial court's conclusion that the automatic perfection of certain purchase money security interests obviates the need for lien insurance, must naturally lead to automatic perfection obviating the need to perfect liens by filing a UCC-1 financing statement. However, there are situations in which the purchase money security interest does not arise. For example, if the item purchased was not for home use. Ala.Code 1975, § 7-9-302(1)(d). One of the named plaintiffs bought a washer and dryer from Farmers to use in her home tanning salon. Did Farmers have a purchase money security interest in the washer and dryer? Likewise, Farmers would lose its purchase money security interest if the purchaser gives the purchased goods away as a gift. Ala.Code 1975, §§ 7-9-307, 7-1-201(32), and 7-1-201(44)(d). One of the named plaintiffs made purchases from Farmers for the express purpose of giving the goods away as a gift. Another named plaintiff gave furniture she had purchased from Farmers to a friend. Did Farmers have a purchase money security interest in the goods that were given away? If a purchaser filed a bankruptcy petition or made additional purchases through add-on contracts, Farmers would lose its purchase money security interest. In re Freeman, 124 B.R. 840 (N.D.Ala.1991), aff'd, 956 F.2d 252 (11th Cir.1992). Three of the four named plaintiffs had add-on contracts. Did Farmers have a purchase money security interest in the property originally purchased? If the named plaintiffs' claims are typical of the class (and they must be for this to be properly certified as a class action), then it is obvious that Farmers had a need for lien insurance.
I am of the opinion that the class was properly certified under Rule 23(b), Ala. R.Civ.P.; however, I think the trial court erred in making Farmers pay the cost of notice. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). I do not believe that notice is mandatory, since this involves a Rule 23(b)(2) class.
I agree that it is for the trier of fact to determine whether Farmers acted "deliberately" when it included the nonfiling premium as a part of the amount financed rather than as a finance charge.
MADDOX and SEE, JJ., concur.
HOOPER, Chief Justice (dissenting).
I dissent. Once again, the Court seems to be creating a cause of action specifically for the use of plaintiffs in class actions. The *1157 $10.00 charge for nonfiling insurance was not a finance charge. It was a charge intended to provide for the seller-creditor protection in lieu of the protection provided by a UCC filing, and, therefore, it is excluded from the calculation of the finance charge. Federal Truth-In-Lending Act, 15 U.S.C. § 1605(d). It costs the purchaser no more to pay this fee for nonfiling insurance than he or she would pay if the lender filed a UCC financing statement and imposed on the purchaser the charge for filing.
If this Court is trying to stop businesses from selling to people who can buy only on credit, then it is doing a good job. With rulings like this, the Court seems to be attempting to become a babysitter for people in every walk of society.
The nonfiling fee is not a finance charge. It is a protection charge. Therefore, I dissent.