**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 97-30826
_____

CONNIE EDWARDS,

Plaintiff-Appellant,

versus

YOUR CREDIT INC,

Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of Louisiana

July 21, 1998

Before GARWOOD, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Connie Edwards ("Edwards") appeals the district court's grant of summary judgment in favor of Your Credit, Inc. ("Your Credit"). Edwards alleges that Your Credit violated the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq*., and Regulation Z, 12 C.F.R. § 226, by improperly disclosing an insurance premium on her loan financing applications. She contends that Your Credit should have included the premium in the finance charge rather than in the amount financed on the applications, an error that allegedly resulted in the understatement of the finance charge and the annual percentage rate ("APR"). Finding a genuine dispute of material

fact to exist, we reverse and remand.

I

Edwards financed the purchase of a TV and VCR on two separate occasions with Your Credit, a consumer finance company. Your Credit makes small loans to consumers to finance the purchase of consumer goods at high interest rates, and in return, takes back a security interest in the item financed. Your Credit does not file a Uniform Commercial Code-1 ("UCC") financing statement to perfect its security interest; instead, it purchases nonfiling insurance. This nonfiling insurance, as we discuss below, protects Your Credit from losses sustained solely as a result of its failure to file a financing statement.[1]

On each occasion, Edwards purchased an item costing $100. Each time, when Edwards completed a loan application, Your Credit disclosed to her that it had added $7.38 as a premium for credit life insurance and $20 as a premium for nonfiling insurance to the item's cost as part of the amount financed, for an amount financed of $127.38. Based on an APR of 168.89 percent, Your Credit then calculated the finance charge on this $127.38, which came to $39.95. Thus, Edwards paid a total of $167.33 on each occasion, or $67.33 in financing costs for each $100 purchase.

Using the $20, Your Credit paid a premium under a master nonfiling insurance policy (the "policy") that Voyager Property and Casualty Insurance Company ("Voyager"), a separate and unrelated

---

[1] This opinion contrasts nonfiling insurance with general default insurance, which, for purposes of this opinion, "protect[s] the creditor against the consumer's default or other credit loss." 12 C.F.R. § 226.4(b)(5).

insurance company, had previously issued it. The policy provided, in pertinent part, that it covers losses sustained where Your Credit is damaged through being prevented from obtaining possession of the secured property or enforcing its rights under the security agreement "solely as the result of the failure of the Insured duly to record or file the Instrument with the proper public officer or public office." Voyager's agent, Consumer Insurance Associates, Inc. ("CIA"), administered the policy. The Administrative Services Agreement between Voyager and CIA gave CIA the "sole right to pay, compromise, reject or deny any such [nonfiling] claim."

Edwards filed a class action lawsuit alleging that Your Credit had violated TILA, Regulation Z, and state law[2] by improperly disclosing the nonfiling insurance premium in the amount financed. She alleged that by including the premium in the amount financed rather than in the finance charge, Your Credit had understated the finance charge and the APR. If Your Credit had properly included the premium in the finance charge, Edwards alleged that the APR would have been 263 percent, rather than 168.89 percent. Because Your Credit calculated the finance charge based on the amount financed, Edwards also argued that it improperly charged her interest on the premium when it included the premium in the amount financed.

Edwards premised her claim on two alternative theories. She first argued that although the policy required Voyager to pay for

---

[2]    Edwards later dismissed her state law claims when she filed an amended complaint.

-3-

losses sustained solely as a result of Your Credit's failure to file a financing statement, the policy did not reflect the actual practices of Your Credit and Voyager because Your Credit routinely submitted and Voyager (through CIA) routinely paid claims for *any* loss, no matter what the cause.  In other words, Edwards argued that the claims practices of Your Credit and Voyager transformed the policy into a general default insurance policy for purposes of the proper TILA disclosure method, and that TILA therefore required that the premium be included in the finance charge.  Second, Edwards claimed that Voyager and Your Credit had an informal understanding pursuant to which Voyager would cancel the policy if Your Credit submitted aggregate claims valued in excess of 89.25 percent of the aggregate premiums paid.  This 89.25 percent figure allegedly served as an informal "stop-loss" provision and prevented the risk of loss from shifting from Your Credit to Voyager.  No risk having shifted, Edwards reasoned, Your Credit had effectively retained the premium as a sort of self-insurance or bad-debt reserve, which again required Your Credit to include it in the finance charge.

Prior to ruling on whether to certify the suit as a class action, the district court granted summary judgment in favor of Your Credit.  The court first noted that the policy's language unambiguously established that the policy covered losses due to the failure to file a financing statement.  It then purported to look behind the policy's language to determine whether Voyager and Your Credit's claims practices had "reformed" the policy into general

-4-

default insurance, either through mutual error or fraud. It concluded that although Voyager may have paid claims for which it was not liable, no mutual error or fraud had occurred because both Voyager and Your Credit had intended the policy to cover nonfiling insurance. The court also looked at summary judgment record deposition testimony to determine that the 89.25 percent figure was only an internal figure that Voyager used to calculate its expected profits and losses and not an informal stop-loss agreement. Finding no evidence that Your Credit was aware of this figure, the court rejected this argument as well, and granted summary judgment in favor of Your Credit. Because the court concluded that Your Credit did not violate TILA, it did not address Your Credit's arguments that the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), preempted this action. Edwards' timely appeal followed.

## II

We review a district court's grant of summary judgment *de novo*. *See New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996). We also review district court determinations of state law *de novo*. *See Salve Regina College v. Russell*, 499 U.S. 225, 239, 111 S. Ct. 1217, 1221, 113 L. Ed. 2d 190 (1991). Summary judgment is appropriate when the record discloses "that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue

-5-

of material fact, but it is not required to negate elements of the nonmoving party's case. *See Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings. *See* FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986). Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

III

Congress enacted TILA to promote the "informed use of credit . . . [and] an awareness of the cost thereof by consumers" by "assur[ing] a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a); *see also Beach v. Ocwen Fed. Bank*, __ U.S. __, 118 S. Ct. 1408, 1409-10, 140 L. Ed. 2d 566 (1998); *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 363-69, 93 S. Ct. 1652, 1657-60, 36 L. Ed. 2d 318 (1973); *Fairley v. Turan-Foley Imports, Inc.*, 65 F.3d 475, 479 (5th Cir. 1995). TILA requires a lender to disclose, *inter alia*, three pieces of information to a borrower: the amount financed, the finance charge, and the APR. *See* 15 U.S.C. § 1638. The APR is calculated by reference to the duration of a loan, its payment

terms, and the finance charge. *See* 15 U.S.C. § 1606; *First Acadiana Bank v. FDIC*, 833 F.2d 548, 550 (5th Cir. 1987).

TILA defines the finance charge as the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a); 12 C.F.R. § 226.4(a). A finance charge includes a "[p]remium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss." § 1605(a)(5); 12 C.F.R. § 226.4(b)(5). Some charges do not have to be included in the finance charge, including filing fees paid to public officials to perfect a security interest, *see* § 1605(d)(1), and the "premium payable for any insurance in lieu of perfecting any security interest otherwise required by the creditor in connection with the transaction, if the premium does not exceed the fees and charges . . . which would otherwise be payable." § 1605(d)(2); 12 C.F.R. § 226.4(e)(2). "If a creditor collects and simply retains a fee as a sort of *self-insurance* against nonfiling it may not be excluded from the finance charge." Regulation Z, Official Staff Interpretation, 12 C.F.R. § 226, Supp. I, at 312 (1995) (emphasis in original).

Understating the finance charge is a "type of fraud that goes to the heart of the concerns that actuate the Truth in Lending Act." *Gibson v. Bob Watson Chevrolet-Geo, Inc.,* 112 F.3d 283, 287 (7th Cir. 1997) (Posner, C.J.). "To promote the Act's purpose of protecting consumers, our court has made clear that creditors must

-7-

comply strictly with the mandates of the TILA and Regulation Z." *Fairley*, 65 F.3d at 479; *Smith v. Chapman*, 614 F.2d 968, 971 (5th Cir. 1980); *McGowan v. King, Inc.*, 569 F.2d 845, 848 (5th Cir. 1978) (noting that TILA is designed to create enforcement through a system of private attorneys general). "[T]he 'remedial scheme of TILA is designed to deter generally illegalities which are only rarely uncovered and punished, and not just to compensate borrowers for their actual injuries in any particular case.'" *Fairley*, 65 F.3d at 480 (quoting *Williams v. Public Fin. Corp.*, 598 F.2d 349, 356 (5th Cir. 1979)).

IV

Your Credit initially contends that the McCarran-Ferguson Act ("McCarran Act"), 15 U.S.C. § 1012(b), bars our consideration of the merits of this case. The McCarran Act provides: "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." § 1012(b). "The McCarran-Ferguson Act establishes a form of inverse preemption, letting state law prevail over general federal rules))those that do not 'specifically relate[] to the business of insurance.'" *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 293 (7th Cir. 1992) (quoting § 1012(b)). A state law preempts a federal statute under the McCarran Act if: (1) the federal statute does not "specifically relate[] to the business of insurance;" (2) if the acts challenged are part of the "business of insurance;" (3) if the state has

-8-

enacted a law "for the purpose of regulating insurance;" and (4) if application of the federal statute would "invalidate, impair, or supersede" a state law.[3]  *See Cochran v. Paco, Inc.*, 606 F.2d 460, 464 (5th Cir. 1979).  It is undisputed that TILA does not "specifically relate[] to the business of insurance." *Id.*

Without expressing any view as to whether the other prongs have been met, the critical issue in this case is whether Your Credit can bring forward any state laws that application of TILA may invalidate, impair, or supersede.  The leading case construing the meaning of the phrase "invalidate, impair or supersede" is *SEC v. National Securities*, *Inc.*, 393 U.S. 453, 462-63, 89 S. Ct. 564, 569-70, 21 L. Ed. 2d 668 (1969).  In that case, the SEC sought to unwind a merger between two insurance companies based on misstatements in their proxy statements, although the state insurance commissioner had previously authorized the merger.  The

---

[3]      The Seventh Circuit recently suggested that phrasing the test for McCarran Act preemption in four parts is erroneous in light of *United States Dep't of the Treasury v. Fabe*, 508 U.S. 491, 501, 113 S. Ct. 2202, 2208, 124 L. Ed. 2d 449 (1993). *See Autry v. Northwest Premium Servs.*, 1998 WL 237426, at *10-11 (7th Cir. May 13, 1998).  The Seventh Circuit uses a three-part McCarran Act preemption test. *Id*. Without mentioning our own four-part test set out in *Cochran*, 606 F.2d at 464, we also recently stated that a state law preempts a federal law under the McCarran Act if (1) the federal law in question does not specifically relate to the "business of insurance;" (2) the state law was enacted for the "purpose of regulating the business of insurance;" and (3) the federal law may "invalidate, impair, or supersede" the state statute. *See Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998). However, we then proceeded to examine what was formerly prong two of the *Cochran* test as part of the revised second prong; thus, in *Munich* we essentially combined prongs two and three of the *Cochran* McCarran Act preemption test.  Because resolution of this issue is unnecessary to the outcome, we express no opinion as to what effect, if any, *Fabe* may have had on our decision in *Cochran.*

insurers sought to use the McCarran Act as a shield, arguing that failure to preempt the SEC's actions would impair, invalidate, or supersede the state insurance commissioner's authorization of the merger. The Supreme Court refused to preempt the SEC's actions, noting that any impairment would be "indirect" because "Arizona has not commanded something which the Federal Government seeks to prohibit." *Id*. at 463, 89 S. Ct. at 570. The Court also found that the federal interest in protecting shareholders was compatible with the state interest in protecting policyholders, and that the federal and state laws were enacted to serve different ends, further eliminating any possible impairment. *Id*. Thus, following the Supreme Court's guidance, we examine whether the conflict between state and federal law is "direct" and the purposes for which the state and federal laws in question were enacted. *Id*.

Your Credit presents several state laws that it alleges application of TILA may invalidate, impair, or supersede. The first two, LA. REV. STAT. ANN. § 9:3516(4) and § 9:3549, are part of the Louisiana Consumer Credit Law, LA. REV. STAT. ANN. §§ 9:3501 *et seq.* Section 9:3516(4) provides that the "[a]mount financed also includes premiums payable for insurance procured in lieu of perfecting a security interest otherwise required by the creditor . . . if the premiums do not exceed the fees and charges which would otherwise be payable." Because this section is virtually identical to § 1605(d)(2) of the TILA and § 226.4(e)(2) of Regulation Z, we fail to see how application of TILA may

-10-

invalidate, impair, or supersede it.[4] *See National Sec.*, 393 U.S. at 463, 89 S. Ct. at 570; *NAACP*, 978 F.2d at 295 ("Duplication [between a state and federal law] is not conflict."). Next, § 9:3549 provides that "[a]ny gain or advantage to the extender of credit . . . from such insurance or its provisions or sale shall not be considered as a . . . loan finance charge in violation of this chapter in connection with any contract or agreement made under this part." Section 9:3549 does not define the meaning of "such insurance," and no courts have interpreted this section. "This part," however, appears to refer to Part VI of the Louisiana Consumer Credit Law, wherein § 9:3549 is found. Part VI covers "credit life insurance, credit dismemberment insurance, and credit health and accident insurance." § 9:3542(A). Since nonfiling insurance is not one of the types of insurance listed in § 9:3542(A), the phrase "such insurance" in § 9:3549 would not appear to cover nonfiling insurance. Hence, this section is simply inapplicable.[5]

_____

[4] Your Credit also contends that because § 9:3516(4) approves nonfiling insurance, we should pretermit our inquiry at this point. Your Credit's argument misses the mark. Whether Louisiana approves nonfiling insurance is not in question; what is in question is whether the premium for which Your Credit charged Edwards was for nonfiling or general default insurance.

[5] Although neither party has brought LA. REV. STAT. ANN. § 9:3516(23)(a) (i) to our attention, we note that Louisiana amended the definition of "loan finance charge" in 1997 by deleting the phrase "premium or other charge for any guarantee or insurance protecting the lender against the consumer's default or other credit loss." 1997 La. Acts 1033 § 1. Because Edwards financed her purchases in January, 1996, this amendment, if it has any effect, would only matter if it were to apply retroactively. No legislative history exists to indicate whether the amendment was intended to have retroactive effect. Louisiana courts have

-11-

Our conclusions with regard to §§ 9:3516(4) and 9:3549 are strengthened by our finding with regard to Your Credit's next argument))namely, Your Credit and *amici* Consumer Credit Insurance Association ("CCIA") argue that Louisiana has created a comprehensive regulatory scheme through the Louisiana Consumer Credit Law, and that this regulatory scheme may be disrupted if TILA is not preempted. *See Crawford v. American Title Ins. Co.*, 518 F.2d 217, 218 (5th Cir. 1975) ("The McCarran Act renders the federal antitrust laws inapplicable when state legislation generally proscribes, permits or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision."). Our review of Louisiana case law suggests that Louisiana has not, in fact, regulated the conduct in question. "The basic difference between the federal and state laws is that the Truth in Lending [Act] is a disclosure law whereas the [Louisiana Consumer Credit Law] governs the essentials of the transaction itself." *Reliable Credit Corp. v. Smith*, 418 So. 2d 1311, 1314 n.2 (La. 1982); *see also Dengel v. Hibernia Nat. Bank of New Orleans*, 539 So. 2d 947, 949 (La. Ct. App. 1989) ("Both sides agree that Louisiana has no disclosure requirements."); Kathleen M. Overcash, Note, *Usury and Consumer Credit Law in Louisiana*, 53 TULANE L. REV. 1439, 1462–63 & n.175 (1979). As TILA and state law

---

indicated that the statute in effect at the time the parties enter into the transaction is the statute that should be applied to determine whether the statute has been violated. See *Plan Inv. of New Orleans, Inc. v. Fiffie*, 405 So. 2d 1094, 1095 (La. Ct. App. 1980). Accordingly, we will not consider what effect, if any, this amendment may have.

were enacted for different purposes to serve different ends, no direct impairment exists. *See also United States v. Cavin*, 39 F. 3d 1299, 1305 (5th Cir. 1994) (holding that the McCarran Act did not strip federal court of jurisdiction over a criminal prosecution for mail fraud by operators of an insurance business even though Louisiana state insurance regulators also sought criminal convictions for the same conduct).

Finally, CCIA presents the Louisiana Unfair Trade Practices Law ("LUTPL"),[6] LA. REV. STAT. ANN. § 22:1211 *et seq.*, for our consideration. It reasons that since LUTPL may also cover the acts complained of here and LUTPL does not provide a private cause of action, if TILA and its private cause of action are not preempted, Louisiana's choice not to provide a private remedy under LUTPL may be invalidated, impaired, or superseded. We recently noted that the "precise degree to which a state statute may be impaired so as to trigger the McCarran-Ferguson Act is not well settled." *Munich Am. Reinsurance Co. v. Crawford*, 141 F. 3d 585, 595 (5th Cir. 1998). Although the circuits have split on whether McCarran Act preemption arises where both state and federal law prohibit the same action but the state does not provide a private cause of

---

[6] CCIA also suggests that LUTPL may provide an alternative basis for McCarran Act preemption because Louisiana has chosen to regulate deceptive trade practices. We have previously rejected this precise argument in *FTC v. Dixie Finance Co.*, 695 F.2d 926, 930 (5th Cir. 1983), albeit under the second prong of McCarran Act preemption test set forth in *Cochran*, 606 F.2d at 464. The analysis set forth in *Dixie Finance* is equally applicable in this case, and for the sake of brevity, we will not repeat it.

action,[7] we have no occasion to address this question here for two reasons.  First, CCIA mischaracterizes Louisiana law. Louisiana courts have not adopted a unified position as to whether LUTPL includes a private right of action.  *Compare Herndon & Assocs., Inc. v. Gettys*, 659 So. 2d 842, 846 n.3 (La. Ct. App. 1995) (rejecting contention that the "commissioner has exclusive jurisdiction over allegations of unfair practices in the insurance industry") *and Citizens Bank & Trust Co. v. West Bank Agency, Inc.*, 540 So. 2d 440, 443 (La. Ct. App. 1989) (same), *with Clausen v. Fidelity & Deposit Co. of Maryland*, 660 So. 2d 83, 86 (La. Ct. App. 1995) (finding no private cause of action to exist under LUTPL where no valid, underlying and substantive claim exists upon which insurance coverage could be based); *see also Tatum v. Colonial Lloyds Ins. Co.*, 702 So. 2d 1076, 1077 (La. Ct. App. 1997) (stating that *Clausen* applies only where no valid, underlying and substantive insurance claim can be brought).  Even if no private

---

[7]    The First, Fourth, Seventh, and Ninth Circuits hold that if a practice is illegal under both state and federal law but federal law provides for a stronger remedy, the McCarran Act does not preempt the federal law. *See Villafane-Neriz v. FDIC*, 75 F.3d 727, 735-36 (1st Cir. 1996) (Federal Deposit Insurance Act); *Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co.*, 50 F.3d 1486, 1492 (9th Cir. 1995) (RICO); *NAACP*, 978 F.2d at 295-97 (holding that McCarran Act did not preempt application of Fair Housing Act against redlining by insurance companies where state law outlawed the practice but provided no private remedy); *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 421 (4th Cir. 1984) (same). The Eighth Circuit has found the McCarran Act preempts a federal law when the federal remedy is stronger, *see Doe v. Norwest Bank of Minnesota, N.A.*, 107 F.3d 1297, 1307 (8th Cir. 1997) (RICO), while the Sixth Circuit has adopted both positions. *Compare Kenty v. Bank One, Columbus, N.A.*,  92 F.3d 384, 393 (6th Cir. 1996) (RICO) *with Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1363 (6th Cir. 1995) (Fair Housing Act).

right of action exists under LUTPL, however, the contention that Louisiana has a reasoned policy against allowing private suits based on fraud and misrepresentations by insurance companies is incorrect. Louisiana permits private fraud and misrepresentation actions against insurance companies. *See Morlte v. Certified Lloyds*, 569 So. 2d 1120, 1124 (La. Ct. App. 1990); *see also Gettys*, 659 So. 2d at 846 n.2. Since Louisiana has not seen fit to prohibit these suits, CCIA's argument that remedies under LUTPL and TILA differ significantly enough to potentially give rise to McCarran Act preemption is meritless. *See Sabo v. Metropolitan Life Ins. Co.*, 137 F.3d 185, 195 (3rd Cir. 1998) (finding no McCarran Act preemption because even though a Pennsylvania statute similar to LUTPL did not contain a private cause of action, state courts had held that common law actions for fraud and misrepresentation covered the same ground).

We have found no state enactment that might be impaired, invalidated, or superseded by the application of TILA. As such, the McCarran Act does not preempt TILA here, and we turn to the merits.

V

A

The district court held that the language of the policy unambiguously created nonfiling insurance. It then treated Edwards' argument that the claims practices of Your Credit transformed the policy into general default insurance as an argument that the policy had been reformed, which it stated may occur in the case of either fraud or mutual error. Finding neither present, the court

rejected Edwards' argument. The court concluded that "[i]f Voyager is paying claims under the policy for which it is not liable, then Voyager has a cause of action against Your Credit to recover these claims. Voyager's decision to pay a claim it may not be required to pay does not constitute a violation of TILA or Regulation Z." On appeal, Edwards contests the district court's conclusion that her argument should be analyzed as sounding in reformation. She renews her contention that Your Credit's claims practices transformed the policy into one insuring against general default.

We agree with the district court that the policy's language unambiguously created a nonfiling insurance policy. *See American Aviation & Gen. Ins. Co. v. Georgia Telco Credit Union*, 223 F.2d 206, 207 (5th Cir. 1955). We disagree, however, with the court's conclusion that Edwards' argument sounds in reformation. Reformation is an equitable remedy that may be used when a contract between the parties fails to express their true intent, either because of mutual mistake or fraud. *See, e.g., Richard v. United States Fidelity & Guar. Co.*, 175 So. 2d 277, 288 (La. 1965). Reformation might apply, for example, if Your Credit submitted a claim arising as a result of a general default and Voyager denied the claim. Your Credit might then argue that the policy should be reformed because the parties intended to write a general default policy, although the policy, as actually written, covered losses due solely to Your Credit's failure to file a financing statement.

Edwards, however, contends that Your Credit and Voyager deliberately structured the form of the policy in stark contrast to

its substance to take advantage of consumers for their mutual benefit. Such an argument is akin to the substance-over-form doctrine in tax law in which we look past the labels the parties give to a structure to determine its economic reality. *See Gregory v. Helvering*, 293 U.S. 465, 469, 55 S. Ct. 266, 267, 79 L. Ed. 596 (1935) (holding that the economic substance of a transaction rather than its form determines its tax treatment); *Waterman S.S. Corp. v. Commissioner*, 430 F.2d 1185, 1192 (5th Cir. 1970) ("[C]ourts will look beyond the superficial formalities of a transaction to determine the proper tax treatment."), *overruled on other grounds, Utley v. Commissioner,* 906 F.2d 1033, 1037 n.7 (5th Cir. 1990). The Supreme Court and many other courts, including this one, have applied the substance-over-form doctrine to consumer finance law. *See, e.g., Mourning*, 411 U.S. at 366 n.26, 93 S. Ct. at 1659 n.26; *Meyers v. Clearview Dodge Sales, Inc.,* 539 F.2d 511, 515 (5th Cir. 1976) ("[A]ppellant's argument elevates form over substance in an effort to avoid the realities of the credit transaction."); *see also Adiel v. Chase Fed. Sav. & Loan Ass'n*, 810 F.2d 1051, 1053 (11th Cir. 1987) (same); *Hickman v. Cliff Peck Chevrolet, Inc.*, 566 F.2d 44, 46 (8th Cir. 1977) ("The [Truth in Lending] Act is remedial in nature, and the substance rather than the form of credit transactions should be examined in cases arising under it."). Thus, the substance-over-form doctrine provides the proper framework for analyzing this case.[8]

---

[8] At oral argument, *amici* CCIA (appearing on behalf of Your Credit) argued that nonfiling insurance is a special form of general default insurance, and that claims under each are

At first glance, Edwards' argument))that Your Credit should have disclosed the premium in the finance charge rather than disclosing it in the amount financed))is difficult to comprehend. After all, Edwards knew that Your Credit was charging her for nonfiling insurance, even if Your Credit included the premium in the wrong category. This apparent difficulty with Edwards' argument has puzzled more than just the district court in this case. Although no court of appeals has addressed whether a creditor's claims practices can convert nonfiling insurance into general default insurance for purposes of the proper method of TILA disclosure, state and federal district courts have reached varying conclusions on this question. Courts that have applied a substance-over-form analysis to look beyond the express terms of a policy to the surrounding circumstances have tended to find questions of material fact preventing summary judgment or have found violations of TILA, Regulation Z, and in some cases, state law.[9] *See Dixon v.*

---

differentiated only by the basis for the claim. Assuming, *arguendo*, that CCIA's argument is correct, we can determine whether a given policy should be classified as general default insurance or nonfiling insurance only by looking at the policy language and the basis of claims filed under it. By CCIA's own argument, therefore, we must look behind the policy's language to Your Credit's claims practices to determine whether Edwards' arguments have merit.

[9] Some of these cases have involved purchase money security interests ("PMSIs") on consumer goods, which are automatically perfected without the need to file a financing statement. *See, e.g.,* LA. REV. STAT. ANN. § 10:9-302(1)(d). Although a loss solely due to a failure to file a financing statement can thus never occur on a PMSI, creditors in some of the above cases have charged debtors for nonfiling insurance. *See, e.g., Myers v. W.S. Badcock Corp.*, No. 94-331-CA, slip op. at 4 (Fla. Cir. Ct. 1995).

*S & S Loan Serv. of Waycross, Inc.*, 754 F. Supp. 1567, 1574-75 (S.D. Ga. 1990) (finding that claims practices of insurer and insured created a material question of fact as to whether policy labeled as nonfiling insurance was in fact general default insurance); *Johnson v. Aronson Furniture Co.*, No. 96-C-117, 1997 WL 160690, at *4 (N.D. Ill. Mar. 31, 1997) (order denying motion to dismiss); *Kirby v. Heilig-Meyers Furniture Co.*, No. 2:95-CV-135PG, slip op. at 2 (S.D. Miss. Oct. 31, 1996) (order denying summary judgment on TILA claims); *Walmsley v. Mercury Fin. Corp.*, No. 92-433-CIV-MARCUS, slip op. at 8-13 (S.D. Fla. Sept. 10, 1993) (order denying motion to dismiss); *Myers v. W.S. Badcock Corp.*, No. 94-331-CA, slip op. at 4-6 (Fla. Cir. Ct. Nov. 22, 1995), *aff'd* 696 So. 2d 776, 783-84 (Fla. Dist. Ct. App. 1996); *Whitson v. Warehouse Home Furnishings Distribs., Inc.*, CV-94-177, slip op. at 10-14 (Ala. Cir. Ct. Aug. 17, 1995) ("Whitson I"), *aff'd in relevant part*, 1997 WL 626108, at *9-12 (Ala. Oct. 10, 1997) ("Whitson II"). By contrast, courts that have only looked at a policy's express terms have tended to reject similar arguments to those presented by Edwards here. *See, e.g., Mitchell v. Industrial Credit Corp.*, 898 F. Supp. 1518, 1527-28, 1531 (N.D. Ala. 1995); *In re Pinkston*, 183 B.R. 986, 989-90 (Bankr. S.D. Ga. 1995). Neither *Mitchell* nor *Pinkston*, however, analyzed the provisions of UCC Article 9, which undercuts their persuasive authority. *See Mitchell*, 898 F. Supp. at 1531; *Pinkston*, 183 B.R. at 989-90.

Because nonfiling insurance generally covers losses due solely to a secured creditor's failure to file a financing statement, it

is important to clearly understand when such a loss can occur. As commentators have noted, nonfiling insurance covers a very narrow risk. *See* Jeffrey Langer & Kathleen Keest, *Interest Rate Regulation Developments in 1995: Continuing Liberalization of State Credit Card Laws and "Non-Filing" Insurance as "Interest" Under State Usury Laws*, 51 BUS. LAW. 887, 895 (1996) ("The purpose of non-filing insurance is to protect lenders against adverse consequences of failing to perfect their security interest by public filing. This is a very limited risk, as it is triggered only when another secured party obtains priority as a result of the creditor's failure to record its lien."). Full understanding of nonfiling insurance, however, comes only from careful analysis of UCC Article 9, and, in our case, Louisiana's enactment thereof.[10]

In Louisiana, as elsewhere, two steps are needed to create a fully enforceable security interest. First, a security interest attaches in the property collateralized when a debtor signs a security agreement or financing statement containing a description of the collateral for which value has been given and in which the debtor has rights. *See* LA. REV. STAT. ANN. §§ 10:9-203(1), 9-402(1). Second, that security interest is perfected (for our purposes) when the creditor files a copy of the security agreement or financing statement with the appropriate public officials. *See* LA. REV. STAT. ANN. §§ 10:9-302(1), -303(1), -402(1), -403. By definition, therefore, a secured creditor who does not file a financing

---

[10] With the exception of UCC § 9-503, Louisiana statutes correspond to the UCC for all purposes relevant to this decision.

-20-

statement is unperfected. The distinction between perfected and unperfected secured creditors becomes important in § 10:9-312(5), which provides that between two perfected secured creditors, the creditor that perfects first in time receives priority.[11] *See* LA. REV. STAT. ANN. § 10:9-312(5)(a). Between two unperfected creditors, the creditor whose security interest attaches first in time has priority, § 10:9-312(5)(b), and in the case of a perfected creditor and an unperfected creditor, the perfected creditor has priority. *See* LA. REV. STAT. ANN. § 10:9-301(1)(a). One final note: Article 9 treats consumers somewhat differently than commercial entities. The most important of these differences for our purposes arises in § 10:9-204(2), which limits the operation of after-acquired property clauses on consumer goods to property acquired within ten days after the secured party gives value for the item.[12] *See id*.

---

[11]    Section 10:9-312(5) provides:

[P]riority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

(b) So long as conflicting security interests are unperfected, the first to attach has priority.

*Id*.

[12]    Section 10:9-204(2) provides that "[n]o security interest attaches under an after-acquired property clause to consumer goods other than accessions [] when given as additional security unless the debtor acquires rights in them within ten days after the secured party gives value." *Id*. "Consumers goods" are goods that

-21-

With this discussion of Article 9 as a springboard, it is apparent that nonfiling insurance (such as the policy at issue here) may cover losses sustained in three possible ways. If another secured creditor subsequently files a financing statement covering goods previously financed by Your Credit, such a loss may be covered because the combined operation of §§ 10:9-301(1)(a) and -312(5) accords priority to the creditor that perfects its security interest first, and Your Credit would have had priority save for its failure to file a financing statement.[13] §§ 10:9-301(1)(a), -312(5)(a); *see also Walmsley*, No. 92-433-CIV-MARCUS, slip op. at 3 n.1 ("[W]here another creditor has filed against the same collateral, and the debtor defaults, Mercury is in a worse position by its failure to file, because its claim is subordinate to the lien creditor."). A covered loss may also occur when a debtor sells an item financed by Your Credit to another consumer (such as at a garage sale) and does not inform the purchaser that the item is covered by a security interest, because under § 10:9-307(2), Your Credit's security interest would have been effective against the purchaser if Your Credit had filed a financing statement.[14] *Id*.

---

are "used or bought for use primarily for personal, family or household purposes." LA. REV. STAT. ANN. § 10:9-109(1).

[13] This analysis assumes that if a good is repossessed and sold, the proceeds from its sale are insufficient to satisfy the debtor's obligations to both creditors.

[14] Section 10:9-307(2) provides that "[i]n the case of consumer goods, a buyer takes free of a security interest even though perfected if he buys without knowledge of the security interest, for value and for his own personal, family, or household purposes unless prior to the purchase the secured party has filed a financing statement covering such goods." *Id*.

-22-

Finally, where a debtor declares bankruptcy and Your Creditor's secured interest would not have been avoidable if Your Credit had filed a financing statement, a covered loss may occur.[15] 11 U.S.C. § 544(a); LA. REV. STAT. ANN. § 10:9-301(3). In other instances, however, whether a loss may be covered depends upon the facts of the case. For example, if Your Credit financed a purchase for a consumer on whom another secured lender had previously filed a financing statement covering all of the consumer's goods, Your Credit would have priority as to the goods it financed if more than ten days had elapsed between the time when the other lender filed the financing statement and Your Credit financed the purchase. § 10:9-204(2). In some circumstances, however, there can be no loss due to Your Credit's failure to file. Two such instances occurs when a debtor skips town or gets thrown in jail and stops paying on the account. While Your Credit may have sustained a loss, filing a financing statement would not have prevented the debtor from skipping town or getting thrown in jail and hence, the loss from occurring. *See Whitson* II, 1997 WL 626108, at *25 (noting that nonfiling insurance does not cover losses caused by debtors that skip town). Again, no covered loss occurs when a debtor signs a security agreement with another secured lender covering goods

---

[15] Leaving aside household exemptions under 11 U.S.C. § 522, under 11 U.S.C. § 544(a), a trustee may assert the rights of a hypothetical lien creditor under LA. REV. STAT. ANN. § 10:9-301(3). Under § 10:9-301(1)(b), a hypothetical lien creditor prevails over an unperfected security interest. Thus, the combined operation of § 10:9-301(1)(b) and 11 U.S.C. § 544 means that Your Credit may sustain a loss solely as a result of its failure to file a financing statement.

previously financed by Your Credit and neither files a financing statement because Your Credit has priority over the other lender under § 10:9-312(5)(b) and can repossess the collateralized property if it so desires. *See id.*

2

We now turn to the summary judgment evidence in this case. Edwards presents the summary judgment record deposition of Rebecca J. Billeaudeaux, Your Credit's manager in Baton Rouge, to support her argument that Your Credit's claims practices transformed the policy into general default insurance for purposes of the proper method of TILA disclosure. According to Billeaudeaux's deposition, Your Credit filed 58 claims under the policy for the month of September 1996, all of which Voyager paid. Although Billeaudeaux's testimony is less than clear, 9 of these 58 claims *may* have been based on covered losses))because another secured creditor had filed a financing statement covering the goods in question, because the debtor sold the goods financed to another consumer, or because of the debtor's bankruptcy.[16] It is unclear whether another 29 claims were based on covered losses because of imprecision in Billeaudeaux's answers. In 21 of these 29 claims, she indicated that although the collateral had been "pledged" to another creditor, no financing statement had been filed by the other

---

[16]    We emphasize the word "may" because some of these losses may not, in fact, have been covered because of limitations imposed by §§ 10:9-204(2) and   -307(2).   As the factual record is insufficient to enable us to make this determination and the issue is nonessential to the outcome, we assume without deciding that these nine claims were filed based on covered losses.

creditor. Neither Article 9 nor Louisiana's enactment thereof uses the term "pledged," so we assume that she meant that the debtor had signed a security agreement with the other creditor covering the good that Your Credit had financed but that the other creditor had not filed a financing statement, meaning that the other creditor would also be unperfected. §§ 10:9-302(1), -303(1), -402(1), -403. In such a case, because § 10:9-312(5) gives priority to the unperfected creditor whose interest attaches first and § 10:9-204(2) limits the application of after-acquired property clauses against consumers, Your Credit would have priority over the other creditor unless the debtor had financed the good from Your Credit within ten days after signing the security agreement with the other creditor. §§ 10:9-204(2), -312(5)(a). Given the narrow scope of coverage in these circumstances, it is unlikely that most of these 21 claims represent covered losses. In the other eight claims in this category, it is impossible to determine from Billeaudeaux's answers whether in fact the claims were filed based on covered losses.[17] Finally, another 20 out of the 58 claims represent losses that could not be covered by the policy. In some cases, the debtor

---

[17] In one claim, for example, Your Credit submitted a claim for an account with an outstanding balance of $0.17. In another, Your Credit submitted a claim for $180.31 even though it had previously obtained a judgment against the debtor for $125.49 and the master policy between Voyager and Your Credit limits claims to the lesser of the value of the collateral or the outstanding balance. Your Credit attempts to negate this damaging evidence by claiming that if it later recovers a judgment against a debtor on whom it has previously filed a claim, it refunds the claim to Voyager. While laudable and partially solving the problem, Your Credit does not allege that it refunds claims to Voyager when it wrongly files a claim but does not recover any money from the debtor.

skipped town or got thrown in jail; filing a financing statement would not have prevented the debtor from skipping town or getting thrown in jail, and so the loss would not result solely from Your Credit's failure to file. *See Whitson* II, 1997 WL 626108, at *25. In approximately 10 of these 20 claims, Your Credit filed suit in state court to recover the collateral, yet it nevertheless filed a claim. Although Your Credit may have sustained a loss on these claims, we fail to see how its loss occurred solely as a result of its failure to file. To summarize: we assumed without deciding that only 15.5 percent of the claims that Your Credit filed and Voyager paid were covered; approximately 50 percent of the claims were most likely not covered, although it is impossible to determine for certain on the factual record now before us; another 34.5 percent of the claims represent losses that, based on the evidence now before us, could not have been covered under the policy. Since as many as 84.5 percent of the claims that Your Credit filed and Voyager paid may be based on losses not covered by the policy, Edwards has created a material question of fact as to whether the policy insured, in substance, against general default.[18] *See also Dixon*, 754 F. Supp. at 1574 (finding a material question of fact because, among other reasons, there was no evidence that the insurer evaluated or rejected a claim made under a nonfiling insurance policy).

---

[18] Your Credit conclusorily alleges that the claims for September 1996 submitted by Edwards are unrepresentative of its overall claims practices. Your Credit did not submit any evidence of its overall claims practices to support its argument. In the absence of any such evidence, we reject Your Credit's argument.

Your Credit attempts to counter Edwards' evidence by submitting evidence suggesting that the policy's substance and form coincided. In his summary judgment record deposition, Tom E. McCraw, Senior Vice President of Operations for Voyager, stated that Voyager does not sell general default insurance and that he does not know anyone who does. McCraw noted that insurers do not sell general default insurance because it gives lenders no incentive to attempt to collect delinquent loans. Undercutting McCraw's testimony is the fact that the very terms of TILA and Regulation Z that require lenders to include premiums for general default insurance in the finance charge, *see* 15 U.S.C. § 1605(a)(5); 12 C.F.R. § 226.4(b)(5), while allowing them to exclude premiums for nonfiling insurance, *see* 15 U.S.C. § 1605(d)(2); 12 C.F.R. § 226.4(e)(2), create incentives for lenders to take out policies denominated as nonfiling insurance that are in substance (perhaps because of claims practices) general default insurance policies. Moreover, two other factors run contrary to McCraw's testimony that general default policies provide no incentive for lenders to attempt to collect delinquent loans: good business relations with their insurer and self-interest. Because 15 U.S.C. § 1605(d)(2) and 12 C.F.R. § 226.4(e)(2) limit the premium for nonfiling insurance that can be excluded from the finance charge to the amount that the state charges to file a financing statement, an insurer cannot raise its rates if a creditor files excessive claims; it can only cancel the policy. Attempts by a creditor to collect delinquent accounts

therefore appease its insurer by reducing the number of claims filed.[19]  Further, since a rational creditor does not want its insurance canceled, even where no formal agreement exists to limit claims, a creditor may attempt to monitor its claims so as to avoid running afoul of its insurer.  For losses above and beyond this amount, self-interest may motivate a creditor to attempt to collect delinquent accounts.

Our review of the method by which Voyager and CIA evaluated claims to determine whether they should be paid reinforces our conclusion that a question of material fact exists.  Under the Administrative Services Agreement between CIA and Voyager, CIA had the "sole right to pay, compromise, reject or deny any such [nonfiling] claim."  While the expense of review of these small claims might be prohibitive, apparently the claims forms were not designed to give any indication of how the claimed loss was attributable to nonfiling.  According to the summary judgment record deposition of Tim Boan, Secretary-Treasurer of CIA, CIA reviewed the claims that Your Credit submitted to ensure that Your Credit had completely filled out the claims form.  Boan also stated

_____

[19]     In his summary judgment record deposition, Tony Gentry, President of Your Credit stated that "it's understood that if our losses get out of control that we will be terminated; that [Voyager] won't write our insurance any longer.  And occasionally they have called up and complained because our losses they deemed excessive. . . . And so when you talk to them from time to time, it is normal for them to say, you know, 'Are you getting your losses down' or 'How is your business going' or 'How is this particular unit doing' . . . They are concerned because they don't like to pay any more losses than they have to. . . . when that [default rate] gets real high we))I don't guess 'real high' is a good choice of words. As the month progresses, we try to get that to an acceptable level."

that CIA occasionally audited Your Credit's claims to ensure that it had attempted to collect a delinquent loan prior to filing a claim. Beyond these limited attempts at verification, Boan stated that "we take their word" that claims are submitted for a proper reason. Thus, Voyager's reliance on CIA to monitor claims filings and CIA's acceptance of Your Credit's averments at face value essentially gave Your Credit freedom to file claims for any reason. Combined with its employees' misunderstanding of Article 9, this became a recipe for disaster.[20]

---

[20] *Amicus* CCIA also argues that because § 1605(d)(2) permits a creditor to exclude the "premium payable for *any* insurance in lieu of perfecting a security interest," whether Voyager paid claims that it was not obligated to pay under the policy could not lead to a violation of § 1605(d)(2) because the policy also covers losses due to nonfiling. Section 1605(a)(5) requires that a "premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss" be included in finance charge. It strains our belief to imagine that Congress would explicitly require that a premium for general default insurance be included in the finance charge in § 1605(a)(5) yet allow the same premium to be excluded from the finance charge in § 1605(d)(2) if the insurance in question also covered defaults caused by nonfiling. *See Whitson*, No. CV-94-177, slip op. at 10-11 ("It would be anomalous indeed for the [Alabama] legislature to prohibit charging for default insurance in the amount financed, but to allow for the very same type of insurance under the guise of nonfiling insurance."). Moreover, acceptance of CCIA's argument would render the second half of § 1605(d)(2)))"in lieu of perfecting a security interest"))meaningless. Accordingly, we reject this argument. CCIA further argues that 12 C.F.R. § 226.4(b)(5) applies only to default or credit loss insurance that can be purchased in addition to charging a filing fee, not to insurance purchased in lieu of the filing fee. CCIA relies on the Truth-in-Lending Manual, which explains that "[c]ommon examples of the insurance against credit loss mentioned in § 226.4(b)(5) are mortgage guaranty insurance, holder in due course insurance, and repossession insurance." Ralph C. Clontz, Jr., TRUTH-IN-LENDING MANUAL ¶ 2.01[2] (1997). Even if we were inclined to rely on the quoted language, this list does not pretend to be exclusive. Moreover, we see no reason to accept CCIA's argument because the language of § 1605(d)(2) and § 226.4(b)(5)))"in lieu of perfecting a security interest"))is clear.

Finally, the district court's conclusion in this case may have been influenced by its notion that Edwards did not suffer any harm. The court explained that "[i]t would appear to the Court that Your Credit did Edwards a favor by allowing her to keep her property and allowing the policy to take care of the debt." As we noted above, understating a finance charge "is a type of fraud that goes to the heart of the concerns that actuate the Truth in Lending Act." *See Gibson*, 112 F.3d at 287 ("[T]he issue is not whether these violations are technical, or whether technical violations should be actionable, or whether consumer class actions should be discouraged, but whether the complaints in these actions state a claim."). "[T]he statutory civil penalties must be imposed for such a violation regardless of the district court's belief that no actual damages resulted or that the violation is *de minimis*."[21] *Zamarippa v. Cy's Car Sales, Inc.*, 674 F. 2d 877, 879 (11th Cir. 1982). "[T]he 'remedial scheme of TILA is designed to deter generally illegalities which are only rarely uncovered and punished, and not just to compensate borrowers for their actual injuries in any particular case.'" *Fairley*, 65 F.3d at 480 (quoting *Williams,* 598 F.2d at 356). Thus, while the harm that Edwards may

---

[21] Congress recently enacted a safe harbor for *de minimis* violations of TILA. *See* 15 U.S.C. § 1649. Section 226.18(d)(2) of Regulation Z, issued pursuant to § 1649, provides that a finance charge will be considered accurate if the amount disclosed does not vary from the actual finance charge by more than $5 for loans under $1,000 and more than $10 for loans over $1000. *Id.* One court has dismissed a TILA claim where the creditor charged a nonfiling insurance premium of less than $10 on a loan of more than $1,000. *See Via v. Heilig-Meyers Furniture Co.*, No. 97-0026-D, slip op. at 5-8 (W.D. Va. Oct. 29, 1997). Your Credit has not contended that this safe harbor is applicable here.

have suffered is relevant to the damages to which she may be entitled, *see* 15 U.S.C. § 1640, it is irrelevant to whether she is entitled to bring an action.

Factually, we conclude that another genuine dispute of material fact exists. Some summary judgment record deposition testimony indicates that Your Credit attempted to repossess debtors' property even when it filed a claim under the policy; therefore, the policy may not have helped Edwards to keep her property. Moreover, because Your Credit included the premium for the nonfiling insurance in the amount financed, it charged Edwards interest on the premium, causing her some actual (albeit small) monetary loss. *See Myers*, 696 So. 2d at 784 ("By including the charges in the amount to be financed, Badcock acquired a fund from which it could offset bad debt losses at the expense of its credit customers. This tactic also increased the base upon which interest would be computed for those credit customers."). Edwards may have also been harmed because the understated APR and finance charge may have led her to choose to purchase goods on credit rather than with cash. *See Gibson*, 112 F.3d at 287. Other summary judgment record testimony, however, indicates that Edwards believed that she benefitted from Your Credit taking out nonfiling insurance because the insurance ensured that they would not place a lien on the goods she purchased. Finally, Your Credit argues that Edwards and other consumers may, on balance, have benefitted from Your Credit's claims practices because these claims practices may have increased Your Credit's capital base, thereby allowing it to make more loans

-31-

and loans to consumers with poor credit histories.

Therefore, although we believe that isolated incidences of claims filed for noncovered losses may not state a cause of action for violation of TILA and Regulation Z, the sheer magnitude of Your Credit's improper claims practices in this case creates a genuine dispute of material fact as to whether those claims practices transformed the policy into one insuring against general default for purposes of its proper disclosure under TILA.[22]   We express no opinion as to whether summary judgment may be appropriate on a more fully developed record than we now have before us, if that record indicates that the form and substance of the Policy may, in fact, coincide.

B

Edwards concedes that no stop-loss provision appears in the policy, but contends that an informal stop-loss agreement existed between Your Credit and Voyager to limit the value of aggregate claims filed to 89.25 percent of total premiums paid.  Edwards contends that this alleged stop-loss agreement prevented risk of loss from shifting from Your Credit to Voyager because it ensured that Voyager would never suffer a loss on the policy.  Therefore,

---

[22]   Edwards also contends that "an attempt to repossess the collateral is a necessary prerequisite to claiming a loss under the nonfiling policy." Given our foregoing discussion of Article 9, it is apparent that this argument is legally incorrect.  If Your Credit examined public filings of financing statements, for example, and determined that another creditor had subsequently filed a financing statement covering the property that Your Credit financed, Your Credit may have suffered a loss solely as a result of its failure to file a financing statement, §§ 10:9-301(1)(a), -312(5)(a), and an attempt to repossess the property would be meaningless.

she claims that the policy is not insurance, but rather a bad-debt reserve held by Voyager, which she contends must be disclosed in the finance charge. *See* Regulation Z, Official Staff Interpretation, 12 C.F.R. § 226, Supp. I, at 312 (1995). After noting that no stop-loss provision appears in the policy, the district court determined that Edwards had failed to raise a dispute of material fact on this argument. It found that no informal stop-loss agreement existed between Voyager and Your Credit because even though certain internal documents of Voyager and CIA indicated that they desired to limit claims to 89.25 percent of aggregate premiums paid in order to earn a profit of 10.75 percent for themselves, neither these internal documents nor the information in them was conveyed to Your Credit.

We agree with the district court that Edwards has failed to establish a genuine dispute of material fact with regard to whether an informal stop-loss agreement existed between Your Credit and Voyager. Tim Boan of CIA testified that losses could be "120 or even 140" percent. Although internal documents bearing the 89.25 percent figure floated around inside CIA and Voyager, Edwards has failed to adduce any evidence that these figures were communicated to Your Credit. Tony Gentry, President of Your Credit, also testified in his summary judgment record deposition that neither he nor Your Credit employees were aware of internal CIA-Voyager profit and loss projections. Finally, at various times during the period in question, the Baton Rouge office of Your Credit filed claims in excess of 89.25 percent of aggregate premiums. Accordingly, we

affirm the district court's grant of summary judgment with regard to this argument.[23]

VI

For the foregoing reasons, the district court's grant of summary judgment in favor of Your Credit is VACATED and the case is REMANDED for appropriate proceedings.

ENDRECORD

---

[23]   Because Edwards has failed to establish the existence of a material dispute of genuine fact on this argument, we do not reach the difficult legal question of whether risk shifting under a master insurance policy is determined by reference to the master policy or the policies issued under the master policy.

JERRY E. SMITH, Circuit Judge, dissenting:


The lynchpin of the majority opinion is its legal conclusion that we may characterize an insurance policy not according to its unambiguous terms or to the state law controlling its application, but by the performance of the insurer under the policy. Because I cannot join in this unprecedented application of the substance-over-form doctrine, I respectfully dissent.

I agree with the majority that insurance purchased "in lieu of" filing under 15 U.S.C. § 1605(d)(2) cannot cover risks that would not have arisen, but for the creditor's failure to file.[24] I cannot agree, however, that this policy, which by its terms and under Louisiana law covered only such risks, is anything but non-filing insurance in accordance with § 1605(d)(2).


I.

A.

No other court of appeals has looked beyond the explicit terms of an insurance policy to characterize its nature according to the claims payment practices of the insurer. The majority's citation of other TILA cases is inapposite, for those cases properly looked to substance over form to give meaning to the necessarily ambiguous terms "credit" and "creditor" in the Act. Thus, the Court in *Mourning v. Family Publications Serv.*, 411

---

[24] *Cf., e.g.,* WEBSTER'S THIRD NEW INT'L DICTIONARY 1306 (1986) (defining "in lieu of" as "in the place of; instead of"); *American Aviation & Gen. Ins. Co. v. Georgia Telco Credit Union*, 223 F.2d 206, 207 (5th Cir. 1955) (pre-TILA non-filing policy covers losses "solely from [creditor's] failure to file").

U.S. 356 (1973), decided that Congress had intended merchants not to be able to escape "creditor" status simply by reformulating what would otherwise be credit transactions as "installment sales." *Id*. at 363-69.

Also, for example, in *Joseph v. Norman's Health Club, Inc.*, 532 F.2d 86 (8th Cir. 1976), the case cited for its substance-over-form analysis in both *Myers v. Clearview Dodge Sales, Inc.*, 539 F.2d 511, 515 (5th Cir. 1976), and *Hickman v. Cliff Peck Chevrolet, Inc.*, 566 F.2d 44, 46 (8th Cir. 1977), a health club sold "lifetime memberships' for $360, payable in twenty-four monthly installments of $15, or for cash, with a discount of ten to fifteen percent, and then sold the notes to finance companies. 532 F.2d at 88. Unsurprisingly, the court found these to be credit transactions in substance. *See Joseph*, 532 F.2d at 93-94.

Here, there is no comparable need to engage in a searching substance-over-form analysis, for there is no ambiguity that needs resolution. In *Joseph*, on the other hand, Congress expressed concern in the terms of the statute, in the delegation of rulemaking capability, and in the legislative history, that the term "credit" not be used in a hyper-formal sense to restrict the TILA's coverage. *See Mourning*, 411 U.S. at 363-69. In essence, Congress knowingly left a statutory interstice to be filled by regulators and courts. *See id*. at 365.

The statute, the regulation, and Louisiana lawSSnot a court's impression of the "economic realities"SSmust dictate our

disposition.  To be sure, the statute does not define

"insurance,"[25]  but that does not give us carte blanche to create

a new rule of law under which insurance is characterized not by

its terms but by a fact-intensive, substance-over-form analysis

that cannot be resolved on summary judgment.

Rather, the silence of the statute directs us to the

regulations and to the applicable background of state common law.

The Supreme Court has often remarked that courts must look to the

established meaning of common law terms when interpreting

statutes.[26]  Furthermore, Regulation Z provides that otherwise

undefined terms "have the meanings given to them by state law or

contract."  12 C.F.R. § 226.3(b)(3) (1998).  The rights and

obligations of the parties under this policy, and the

characterization of that policy as non-filing insurance or

something else, depend upon the controlling state law.

B.

Under Louisiana law, which governs this policy, the

arrangement between Your Credit and Voyager is non-filing

insurance.  A Louisiana insurance contract is interpreted

according to general contract principles.  See *Battig v. Hartford*

---

[25]  Again, I note that we may properly decide what sort of insurance
qualifies as insurance purchased "in lieu of filing."  That is, we may decide
what sort of risks may be covered by a policy in order to fall within the
statutory terms.  It goes far beyond our role as statutory interpreters, however,
when we define as a matter of federal law which risks the policy covers.

[26] *See, e.g., United States v. Wells*, 117 S. Ct. 921, 927 (1997) (citing
*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992) (citing *Community
for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989))).

*Accident & Indem. Co.*, 608 F.2d 119 (5th Cir. 1979). Louisiana
law provides that

> the parties' intent, as reflected by the words of the
> policy, determines the extent of coverage. Such intent
> is to be determined in accordance with the plain,
> ordinary, and popular sense of the language used in
> the policy, unless the words have acquired a technical
> meaning. . . . An insurance contract should not be
> given an interpretation which would enlarge or restrict
> its provisions beyond what is reasonably contemplated
> by its terms or which would lead to an absurd
> conclusion. If the language in an insurance contract
> is clear and unambiguous, the agreement must be
> enforced as written. In such a case, the meaning and
> intent of the parties to the written contract must be
> sought within the four corners of the instrument and
> cannot be explained or contradicted by parol evidence.
> . . . [T]he use of extrinsic evidence is proper only
> where a contract is ambiguous after an examination of
> the four corners of the instrument.

*Highlands Underwriters Ins. Co. v. Foley*, 691 So. 2d 1336, 1340
(La. App. 1st Cir. 1997) (citations omitted).[27]

---

[27] *See also, e.g.,* LA. CIV. CODE ANN. art. 2046 (West 1987) (stating that "when
the words of a contract are clear and explicit and lead to no absurd consequences,
no further interpretation may be made in search of the parties' intent"); *Heinhuis
v. Venture Assoc.*, 959 F.2d 551, 553 (5th Cir. 1992) (holding

(continued...)

This insurance contract unambiguously defines the scope of its coverage. By its plain terms, the agreement insures against losses incurred "solely as the result of the failure of the Insured duly to record or file." Under Louisiana law, accordingly, the policy is non-filing insurance.[28]

Furthermore, it does not matter whether the contract included an explicit or implicit stop-loss provision: Insurers are permitted, under Louisiana law, to limit their liability and impose reasonable conditions on their obligations, so long as those do not conflict with law or public policy. *See Scarborough v. Travelers Life Ins. Co.*, 718 F.2d 702, 707 (5th Cir. 1983).

In short, the characterization of this insurance policy is directly controlled by Louisiana law, under which the policy covers only losses caused by failure to file. A federal court should not interfere by holding to the contrary.


II.

Even if it is sometimes appropriate to apply a substance-over-form analysis to characterize insurance under the TILA, the form of this policy is not at odds with its substance. Rather, the form of the policy and the pattern of performance thereunder

---

(...continued)
that a "court applying Louisiana law should interpret a policy according to its plain meaning and not distort its meaning to introduce an ambiguity").

[28] It may be that Your Credit filed, and Voyager paid, claims not within the scope of the coverage. That, however, is not properly the subject of this suit under the TILA. If bogus claims were filed and paid, Voyager and not Edwards may sue to enforce the terms of the policy.

are in keeping with legitimate business practices, rather than the sort of sham to which courts will assign consequences based on its substance, rather than form. Substance-over-form is inapplicable on these facts.

The substance-over-form principle is a doctrine of tax law that prohibits taxpayers from avoiding the tax consequences of a transaction by disguising it as something that it is not. Thus, for example, where a taxpayer purchased bonds with an interest rate of 2.5 percent and financed that purchase with a debt to the bond issuer at a rate of 3.5 percent, the Supreme Court found the transaction to be a "sham," crafted *solely* as a tax avoidance scheme. *See Knetsch v. United States*, 364 U.S. 361, 366 (1960). There was no economic reason to engage in the transactionSSno chance for profit, other than tax-avoidanceSSand the Court therefore looked to substance rather than form. The search for substance over form has been analogized to the practice of piercing the corporate veil. *See* 1 BORIS I. BITTKER AND LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 4.3.3, at 4-34 n.36 (2d ed. 1989). In either case, however, the respective doctrines are applied only in exceptional circumstancesSScircumstances unlike those presented here.

An individual's chosen form will not be set aside lightly. Indeed, it has been said that "lawyers who do not know that sometimes form controls, should not be practicing law." *Id*. at 4-34 (quoting PAUL, STUDIES IN FEDERAL TAXATION 89 n.304 (1937)). Thus, where there is a "genuine multiple-party transaction with

economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties." *Frank Lyon Co. v. United States*, 435 U.S. 561, 584-85 (1978). Similarly, when a corporation is not used for an illegal purpose, its veil will be pierced only where it is a sham or is the alter ego of its shareholders. *See Fidelity & Deposit Co. v. Commercial Cas. Consultants, Inc.*, 976 F.2d 272, 274-5 (5th Cir. 1992). Courts pierce veils and look to transactions' "substance" only when they are convinced that legal formalities are devoid of real consequence, used solely to avoid tax or other liability.

There is a legitimate business reason for Voyager's payment of claims beyond the terms of the policy: The cost of investigating those claims would have been far greater than the value of the claims paid. As far as I am aware, it is a common and perfectly legitimate practice for an insurer to pay, rather than always to dispute, claims outside the scope of coverage. This policy specifically provided that the insurer retained the right to "pay, compromise, reject, or deny" any claim. An insurer may choose to pay a claim for any reason, with or without an evaluation of its merit. The TILA does not impose on insurers a duty to investigate. There is a legitimate business reasonSSoutside any purported desire to skirt the TILASSto

characterize the policy as non-filing insurance rather than as general default. Although Voyager might pay small claims, there is every reason to believe that it would investigate and, in appropriate circumstances, refuse to pay claims involving any significant amount of money. The summary judgment is consistent with this conclusion. Therefore, the policy's coverage of risk arising "solely as a result from the . . . failure to file" is not an empty formality, but has real substance. Even were it generally appropriate to apply a substance-over-form analysis to characterize insurance policies, the policy at issue here would remain what it purports to be: insurance purchased in lieu of filing.

### III.

Finally, I note the policy implications of this unprecedented and improper application of the substance-over-form doctrine. The majority's rule will encourage litigation, for plaintiffs may properly read this decision as holding that a pattern of performance will trump plain contractual provisions in determining parties' rights and obligations. Once such litigation is filed, the majority's fact-intensive analysis will allow most, if not all, plaintiffs to survive summary judgment.

Furthermore, by effectively imposing a duty to investigate and dispute potentially bogus claims, this rule will hamper the free and efficient functioning of the insurance industry. In essence, this duty to investigate will hinder insurers from

-42-

issuing small policies, where the likely value of claims asserted will be less than the likely cost of investigation.  That is, a rational insurer should calculate its rates based upon the *settlement value* of claims: their dollar amount or the cost of disputing them, whichever is lower.  Under this rule, insurers must instead incur and pass on the cost of disputing all potentially illegitimate claims, even where its settlement value is less than the cost of disputing it.

Moreover, the majority's rule will do nothing to help debtors such as Edwards.  True, the inclusion of non-filing insurance premiums in the amount financed raises the effective interest rate on the underlying principal.  But if the market will bear such a high price for money, which it apparently will, there is every reason to believe that creditors will continue to charge that price.  Whether some portion of the total price is included (and disclosed) on one line rather than another is largely irrelevant to the debtor's bottom line: the amount he pays for the loan.

Where the market will bear a given bottom line, creditors will naturally achieve this bottom line by the inclusion of various charges.  And debtors will continue to pay astronomical prices for cash.  While we may believe that certain debtors act improvidently, and while we may privately condemn certain creditors for tempting individuals with the lure of quick money at high rates, as a matter of both law and economics we cannot prevent these transactions from taking place.

IV.

The majority disregards the unambiguous language of this insurance policy and its plain effect under Louisiana law.  It requires a federal court to characterize the scope and coverage of an insurance policy according to the performance of the parties thereunder.  As a result, it transforms contract interpretationSSa quintessential question of lawSSinto a question of fact that will almost always allow industrious plaintiffs to survive summary judgment.  Because I cannot join this unprecedented departure, I respectfully dissent.